## IN RE DISBARMENT OF ITHAMAR TRACY.[1]

No. 29,482.

March 27, 1936.

[1]Reported in 266 N. W. 88, 267 N. W. 142.

36

*Oscar G. Haugland* and *Thomas E. Sands, Jr.*, for State Board of Law Examiners.

*F. M. Miner* and *Ithamar Tracy*, for respondent.

PER CURIAM.

The accusations of misconduct against Mr. Tracy were made by three petitions of the State Board of Law Examiners, the original having been followed by two supplements. The evidence under the first was taken before the Honorable John A. Roeser, judge of the seventh judicial district, as referee, and that under the supplemental petitions before the Honorable Gustavus Loevinger, judge of the second judicial district. Our consideration of the case has been much aided by their exhaustive findings of the facts.

Mr. Tracy is now past 40 years of age. He was admitted to practice in 1918. For all but less than a year since, he has been much engaged in Minneapolis in a business the nature of which will be discussed later. "He appears to be a man of more than average intelligence, more than ordinary initiative and more than usual vigor in pursuit of personal or professional objectives. He seems to be resourceful, aggressive, bold, persistent, determined." With such qualities, it is strange that he had to make testimonial admission of utter ignorance not only of the tenor but also of the existence of the "Canons of Ethics" of his profession as adopted by the American Bar Association and the Minnesota State Bar Association. The comprehensive character of that ignorance continued until the chairman of the committee on ethics of the State Bar Association handed him a copy of the "Canons" in 1931. Judge Loevinger has this to say of his appearance as a witness on his own behalf: "At times it seemed that he was willing to resort to evasion, equivocation or subterfuge to gain an advantage or to escape from a difficulty."

The charges grow out of Mr. Tracy's activities as a liquidator of the indebtedness of small debtors, most of them in the ranks of labor. That sort of business he procured through systematized solicitation. The facts cannot be made to appear better than by quoting the findings of Judge Loevinger:

"During the years 1928, 1929 and a substantial portion of 1930 Tracy, in connection with his law practice, engaged in the business of rendering financial aid to involved debtors * * * working-men and women receiving salaries or wages who had become in-debted to a number of creditors and who sought relief from worry, embarrassment, suits and garnishments through Tracy's services. In order to induce such persons to consult him * * * Tracy solicited their patronage by advertisements in newspapers, by let-ters, cards and printed matter sent through the mails and by per-sonal interviews. * * * During a substantial part of 1931 Tracy solicited legal patronage by sending out pamphlets advocat-ing changes in the garnishment laws beneficial to employed persons and containing a picture of himself and a reference to his skill and zeal on behalf of persons garnished. * * *

"Involved debtors engaging the services of Tracy were generally asked to sign an application, a statement and a contract in the form or substantially in the form of Exhibit C attached to the petition herein. The contract was usually accompanied by a note signed by the debtor and generally by one or more co-signers, usually the wife, a relative, a friend or a fellow employe. Sometimes additional security was obtained in the form of an assignment of wages or a chattel mortgage on the household furniture or an automobile. The amount of the contract and note was usually arrived at by adding to the total indebtedness of the debtor approximately 10 to 30 per cent of such indebtedness as a 'carrying' or financing charge or a service charge. The amount of the financing or service charge de-pended on such factors as the amount of the note, the security and the length of time required by the client to pay up in full. Tracy, in addition to the charge above mentioned, retained as additional compensation any discounts received from creditors with whom a

cash settlement was made. Settlement was made with each creditor on the best terms obtainable and independently of the other creditors. Creditors whose accounts could not be compromised were generally prorated. Sometimes the creditors were divided into two groups, one with whom settlements were to be negotiated and one whose members were to be prorated. By prorating is meant that a creditor received a proportionate share of the periodic (weekly, biweekly or monthly) payments made by the debtor to Tracy until all the creditors were paid in full with no deductions or discounts. Tracy got the money to pay the creditors from the proceeds of the notes given him by the debtors, which he negotiated, and from the periodic payments of his clients."

Accompanying each contract, on a printed form, was an "application for services of Ithamar Tracy in the adjustment, liquidation or payment of my bills and accounts payable." Completely filled in, it would give the reader much of the personal history of the signer and his whole status as to family, income, property, life insurance, etc. The whole would be very useful to a creditor subsequently wanting to collect a debt from the signer. Much of it was practically useless to a lawyer wanting only to serve him professionally. The last "question" of this so-called application was No. 14, reading thus:

"I authorize you to obtain such information as you may require concerning the statements made in this application and agree that the application shall remain your property whether or not your services are obtained."

Mr. Tracy has not invited our attention to anything to explain, to say nothing of justifying, that authorization. The point is that any right-minded lawyer, having properly obtained so much written information concerning one intending to become his client, would have perceived the impropriety of retaining the document in his possession if the relationship of attorney and client was not in fact entered into.

Again quoting Judge Loevinger:

"The effect of the making of these arrangements was to lull the debtor into a sense of security. He believed he had put his affairs into the hands of a lawyer, who would raise sufficient money on his note to pay in full the bills to be settled and who would protect him from hounding collectors or garnishment levies. He had in fact for the time being at least more than doubled his then outstanding obligations; he made himself liable for the payment of double interest; he left it to the discretion of Tracy to assert or not to assert any offset or defense to any of his listed debts; he assigned the benefits of any offset or defense successfully asserted by Tracy to the latter; if any of his original debts were unsecured he in effect converted them into secured debts through the system of co-signers on his note; he in effect by the same system made his whole indebtedness plus the financing or service charges not dischargeable by his own bankruptcy. He had in effect made a contract employing Tracy as his attorney terminable only at the will of Tracy. Tracy by becoming guarantor of his client's note for the raising of funds to pay his client's bills inevitably put himself into a position in which his client's default would affect him adversely, independently of the professional relationship. Under the contract it was to the financial advantage of Tracy to settle with his client's creditors for as small a fraction of their claim as possible, regardless of the wishes or interests of his client and by whatever argument might be most persuasive. The larger the discount the greater the profit of Tracy and the greater the possible injury to the credit of the client. Tracy usually took an assignment of any account that was paid or settled. Regardless of the amount of the discounts to Tracy, clients were required to pay him the bills in full. Tracy testified that although the notes given by clients bore interest, the only time he asked them to pay interest was when he had to sue. Tracy, in addition to the financial aid he furnished his clients, was expected to provide the legal services necessarily and incidentally involved, including consultation, advice and court appearances."

The liquidation business resulted for many of Mr. Tracy's clients in his causing them to resort to voluntary bankruptcy. The de-

tails of this business need not be further examined. Concerning much of it there is no criticism of the accused. Concerning some there is conflict of testimony which has not been finally resolved for us by the findings. But as comment on the whole of it Judge Loevinger does say this:

"Seemingly Tracy gave little personal service to the bankruptcy matters, avoiding appearing at hearings when possible. A delay or default by the client in the payments on the note [Tracy invariably exacting at the outset a note from his client usually for $150 to cover both his fees and expenses] would generally result in delay in completing the bankruptcy proceedings."

The notes taken with the liquidation business were negotiable, and it was the fixed practice of Mr. Tracy to negotiate them under circumstances making the indorsees apparent holders in due course. There is no evidence that Tracy explained to any client that the transaction had that result. Each contract did authorize Tracy to use the signer's note "to raise the necessary money to effect this liquidation."

Many of the notes were promptly assigned to one Benninghoff, who was not slow in suing the makers in case of default. Tracy frequently appeared as his attorney. Not always, but in many of such cases, garnishment proceedings were resorted to. In others Tracy sued on the notes himself and resorted to garnishment. In some, as where the debtors were railroad employes, he must have known that he was subjecting his clients to the danger of losing their jobs. In one suit on a client's note there was a successful defense on the ground of usury.

We need not extract from the record and voluminous exhibits more of their details. A lawyer is entitled to all the reasonable emoluments which he can legitimately get, but his profession is always one of service to others. The financial returns will be, in the long run, commensurate with the quality and amount of such service. Always, between attorney and client, the relation is one of personal trust and confidence. The attorney is a fiduciary. That automatically should bar anything which smacks of exploitation of,

rather than service to, the client. Wilful transgression of the line between service and exploitation is professional misconduct. Circumstances may be imagined so far to excuse it in isolated or exceptional cases as to warrant no other measure of discipline than admonition. But here the record discloses a long course of conduct plainly motivated by exploitation rather than service. The attorney's interest rather than that of his client was dominant always and too often controlling as against the true interest of the client. How completely Tracy's personal financial interest was opposed to that of each client the moment he had the liquidation agreement signed is plain. Nothing could have been done to make them more incompatible.

We might, it may be assumed, pass with less than disbarment the offensive, systematized, and long continued solicitation. In that connection it may be well to say that the warning given in In re Greathouse, 189 Minn. 51, 248 N. W. 735, was then deemed enough for the time being. If others come before us, guilty notwithstanding the warning of a similar offense, it will be difficult to convince us that disbarment should not follow.

Mr. Tracy's organized solicitation was not continued after the decision in In re Greathouse. But it had other features we cannot overlook. His willingness systematically to exploit clients is the most serious. A lawyer who procures a harassed client's signature to a contract which more than doubles his indebtedness, without advising the client fully and fairly of the reach of the transaction, is inexcusably derelict. If the new and added increment of obligation be, at the lawyer's instance, evidence by a negotiable note wherein he is payee, forthwith to be indorsed to a holder in due course, the offense demands discipline. If it be multiplied as here, it shows a callous indifference. (ignorance is not and could not be pleaded) to mandatory professional obligations. That indifference, long continued and difficult of eradication, demonstrates utter lack of the sense of professional obligation, the presence and continued functioning of which is essential to the right of a lawyer to remain such.

There is another aspect of the case not to be ignored. The lawyer's duty is not to his client alone. He has a duty to his profession, which, negatively stated, is to refrain from conduct tending unavoidably to bring the profession into disrepute. One intended and inescapable result of the contracts which Mr. Tracy obtained from his needy clients was to make him, rather than the client, the only one to profit from negotiations with creditors for a reduction of their claims. The evidence suggests, and nothing else was to be expected, that the creditors justly resented the resulting status. They could not be blamed much if they regarded the contracts as but another device of a grasping lawyer to exploit both debtor and creditor for his own profit. That is the precise sort of thing which all lawyers who observe the ethical standards of their profession consistently and diligently seek to avoid. There is nothing in the record to disclose that the impropriety of his conduct from that viewpoint ever occurred to Mr. Tracy.

The record renders unavoidable the conclusion that Mr. Tracy has been guilty of (1) systematic solicitation, (2) persistent and wilful assumption of a contractual status wherein his personal interest was directly opposed to that of his client, (3) without advising the latter of the new, added, and more dangerous character of the obligation evidenced by the negotiable note, and (4) choosing deliberately to make exploitation rather than service the goal of professional endeavor, (5) the whole being plainly a course of planned conduct, which, whatever its objective, tended plainly and unavoidably to subject the profession to disrepute.

That summary, well supported by evidence and findings, demonstrates either such persistent refusal, or such incurable inability, to measure up to and observe the standards of conduct which the law imposes upon its advocates and ministers that the subject should cease to be numbered among them.

■ There has been some suggestion that adjustment and collection agencies have indulged in the sort of business conducted by Mr. Tracy; and that as long as it is conducted by anybody lawyers should be permitted to do likewise. The sort of thing we have in mind was illustrated in Adjustment Service Bureau, Inc. v. Buelow,

196 Minn. 563, 265 N. W. 659. There the mechanism of the aid offered debtors appears similar to the service contract scheme evolved by Mr. Tracy. That sort of business, it seems, is being carried on by laymen. If so, it is none of our business for the present and may never be unless, in a proper case, it is challenged as being an illegal practice. We are not suggesting that it is. Yet there is the possibility that it may be so extended as to be open to that condemnation.

The point is in the fundamental difference between any commercial business and a profession. The vocation of a lawyer is a profession. In consequence, his conduct as attorney, counselor, and advocate is to be measured not by the indefinite, still developing, and largely unwritten standards of trade and countinghouse, but by those of his profession, which, while they have not reached their ultimate state, have yet attained the development and degree of formulation evidenced by the Canons of Ethics. That being so, lawyers will do well to remember, for their own solace if for no other reason, that they are engaged in a profession rather than a business and that it is by professional rather than commercial standards that their conduct will be judged when properly called in question. That basic and irremovable distinction both exposes and explains the error of those who choose to enter the legal profession supposing it to open an easy road to affluence.

By 1 Mason Minn. St. 1927, § 5697, subd. 2, it is declared that no "proceeding for the removal or suspension of an attorney at law shall be instituted unless commenced within the period of two years from the date of the commission of the offense or misconduct complained of, or within one year after the discovery thereof." That statute has been much stressed on behalf of Mr. Tracy. By the findings of Judge Roeser, as much as possible was done to acquit him because many of the transactions inquired about had taken place more than two years before the filing of the petition. This is not the first case wherein the statute has been stressed in similar fashion.

The duty to declare that either legislative or executive department has transgressed its constitutional authority is disagreeable enough

where there is no suggestion that the field of the judiciary has been invaded. The task becomes most unpleasant when the invasion, if any, is of our own province. Notwithstanding judicial aversion to self-defense, the duty is sometimes inescapable. Few as are the occasions when judges have been required to protect their own constitutional domain against unintentional legislative intrusion, we cannot, try as we may, escape the conviction that this case presents one of them.

The question has been pressed here before, but we have purposely avoided its decision. The rule of continuing misconduct, applied where the initial offense was the misappropriation of a client's funds, has enabled us to say that the misconduct continued until repayment. In re Gerlich, Jr. 187 Minn. 88, 244 N. W. 414. Here there is no such avenue of escape, short of wilful evasion, from performance of a distasteful duty. We cannot avoid the conclusion that the statute is unconstitutional as an attempted projection of legislative power into the judicial department. That follows inescapably the well settled proposition "that a court which is authorized to admit attorneys has inherent jurisdiction to suspend or disbar them. This inherent power of the court cannot be defeated by the legislative or executive department. The removal or disbarment of an attorney is a judicial act." In re Greathouse, 189 Minn. 51, 55, 248 N. W. 735, 737. That conclusion is settled law not only here but also in "the great majority of courts in this country." Re Opinion of the Justices, 279 Mass. 607, 611, 180 N. E. 725, 728, 81 A. L. R. 1059. See also In re Cannon, 206 Wis. 374, 240 N. W. 441; In re Richards, 333 Mo. 907, 63 S. W. (2d) 672; In re Bailey, 30 Ariz. 407, 248 P. 29; In re Bruen, 102 Wash. 472, 172 P. 1152; In re Olmsted, 292 Pa. 96, 140 A. 634; Ex parte Steckler, 179 La. 410, 154 So. 41; Rosenthal v. State Bar Examining Committee, 116 Conn. 409, 165 A. 211, 87 A. L. R. 991; In re Lavine, 2 Cal. (2d) 324, 41 P. (2d) 161; Brydonjack v. State Bar, 208 Cal. 439, 281 P. 1018, 66 A. L. R. 1507; Wernimont v. State ex rel. Little Rock Bar Assn. 101 Ark. 210, 142 S. W. 194, Ann. Cas. 1913D, 1156; People ex rel. Colorado Bar Assn. v. Irwin, 60 Colo. 177, 152 P. 905; In re Leach, 134 Ind. 665, 34 N. E. 641, 21 L. R. A. 701; Hanson v.

Grattan, 84 Kan. 843, 115 P. 646, 34 L.R.A.(N.S.) 240; In re Eaton, 60 N. D. 580, 235 N. W. 587; Danforth v. Egan, 23 S. D. 43, 119 N. W. 1021, 139 A. S. R. 1030, 20 Ann. Cas. 418; In re Platz, 42 Utah, 439, 132 P. 390; In re Application for License to Practice Law, 67 W. Va. 213, 67 S. E. 597; State Board of Law Examiners v. Phelan, 43 Wyo. 481, 5 P. (2d) 263, 78 A. L. R. 1317; Ex parte Garland, 4 Wall. 333, 18 L. ed. 366; Ex parte Secombe, 19 How. 9, 15 L. ed. 565; In re Day, 181 Ill. 73, 54 N. E. 646, 50 L. R. A. 519; Splane's Petition, 123 Pa. 527, 16 A. 431; People v. Peoples Stock Yards State Bank, 344 Ill. 462, 176 N. E. 901; In re Branch, 70 N. J. L. 537, 57 A. 431; In re Application of K., 88 N. J. L. 157, 98 A. 668; State Bar Comm. ex rel. Williams v. Sullivan, 35 Okl. 745, 131 P. 703, L. R. A. 1915D, 1218. A contrary view seems to have been controlling in In re Evans, 72 Okl. 215, 179 P. 922 (repudiating the view expressed in State Bar Comm. ex rel. Williams v. Sullivan, 35 Okl. 745, 131 P. 703, L. R. A. 1915D, 1218); In re Cooper, 22 N. Y. 67; and Re Applicants for License to Practice Law, 143 N. C. 1, 55 S. E. 635, 10 L.R.A.(N.S.) 288, 10 Ann. Cas. 187.

It should be noted that the cases above cited in support of the conclusion here reached may be divided into two classes: Some hold that within certain limits it is competent for the legislature to prescribe minimum qualifications for admission and grounds for disbarment and to prescribe procedure as long as they do not interfere with the inherent power of the courts ultimately to determine who shall practice before them. Others hold that it is incompetent for the legislative department to attempt in any way to regulate the admission and disbarment of attorneys. It might appear at first blush that some of the former are not in harmony with the views here expressed. For example, in Hanson v. Grattan, 84 Kan. 843, 845, 115 P. 646, 647, 34 L.R.A.(N.S.) 240, the court said: "It is generally conceded, however, that it is competent for the legislature to prescribe the qualifications for admission and the grounds for disbarment, as well as the procedure therein." But that sentence was pure dictum and is not an accurate statement of the law. In State Board of Law Examiners v. Phelan, 43 Wyo. 481, 491, 5 P. (2d) 263, 266, 78 A. L. R. 1317, a statute providing for jury trial of

disbarment cases was held constitutional. However, the court was careful to add that the prescribed procedure was not exclusive and that "the legislature cannot pass a valid law that must be followed in every case, and would prohibit the disbarment of attorneys except on the verdict of a jury." These two views are further discussed in annotations in 10 L.R.A.(N.S.) 289; 66 A. L. R. 1512; and 81 A. L. R. 1064. They need not be further considered. The important thing is that both equally support the conclusion here reached.

In some of the above cases statutory declarations concerning admission and discipline of attorneys were followed by the courts, not because they were valid and binding laws but rather because they were found to be reasonable and just in their application, tended to promote an orderly and systematic procedure, and because they were considered sound expressions of public policy. So also, unconstitutional or not, our desire is to comply with the legislative will whenever we can without ceasing to function as independent judges. But the statute in question is not only one of attempted limitation but also, and even more importantly, a rule of evidence. We do not prosecute attorneys by subjecting them to discipline. In re Rouss, 221 N. Y. 81, 116 N. E. 782; People ex rel. Karlin v. Culkin, 248 N. Y. 465, 162 N. E. 487, 60 A. L. R. 851. Our inquiry is into their professional conduct, and the question for decision is whether or not the character thereby evidenced is such as to demand discipline. Hence, what the legislature inadvertently has attempted is to declare that we cannot consider as evidence any conduct of an attorney except such as has occurred within the stated and rather short periods. There could be no more obvious attempt to say what judges should and should not consider as evidence in a controversial matter, the decision of which the constitution, by the departmentalization of the powers of government, has delegated exclusively to the courts.

"No statute can control the judicial department in the performance of its duty to decide who shall enjoy the privilege of practicing law." Re Opinion of Justices, 279 Mass. 607, 611. Our decision now is simply that, for the reasons stated, Mr. Tracy is no

longer entitled to that privilege. In passing upon such a question courts must be permitted to determine for themselves what they will and what they will not consider as competent evidence. They will not exclude "unexplained, unreasonable delay in presenting the charges." Nor will they overlook the fact that, "by reason of such delay, the accused has been deprived of a fair opportunity of securing proof to meet the accusation." They will not ignore the staleness of the charges if they be ancient, nor are they likely to consider them at all if they are old and there has been a complete cessation of the improper conduct with evidence of sincere and enduring reformation. The limitations are not of time but of propriety and relevancy. One important inquiry will be whether "from the nature or circumstances of the particular case, it appears that it would be unjust or unfair to require the attorney to answer as to such occurrences." People ex rel. Healy v. Hooper, 218 Ill. 313, 322, 75 N. E. 896, 900.

Judgment of disbarment will be entered.

So ordered.

### UPON APPLICATION FOR REARGUMENT.

On May 8, 1936, the following opinion was filed:

PER CURIAM.

Mr. Tracy's petition for rehearing is for the most part one for the modification of our decision as to details which can in no way change the result. As a matter of justice to him, however, the following is added by way of explanation. He complains of this sentence:

"For all but less than a year since, he has been much engaged in Minneapolis in a business the nature of which will be discussed later."

He wants that language changed to read thus:

"Prior to June, 1930, he was much engaged in Minneapolis in a business the nature of which will be discussed later."

Without reëxamination of the record, we are willing to grant the request with this qualification. This proceeding has been pending

a long time. It is perfectly clear that whenever the systematic solicitation of business was discontinued there was then an accumulation of matters procured as indicated, which Mr. Tracy had to liquidate. In one case, even during the hearing before Judge Loevinger, he resorted to garnishment of a client's wages in order to enforce one of his objectionable contracts.

Mr. Tracy next objects to Judge Loevinger's comment quoted in our opinion and reading thus:

"At times it seemed that he was willing to resort to evasion, equivocation or subterfuge to gain an advantage or to escape from a difficulty."

It is claimed as to that language that Judge Loevinger's intention was to refer, not to Mr. Tracy's appearance as a witness, but rather to his relations with his clients. Let it be so, and the subject of the comment but gets from one frying pan into another, if not into the flame itself.

Another objection is to this language, again quoting from the findings:

"Seemingly Tracy gave little personal service to the bankruptcy matters, avoiding appearing at hearings when possible."

This sentence Judge Loevinger on motion deleted from his findings, a matter which in our decision we overlooked. That fault is ours. In consequence, our decision should be modified to this extent. The objectionable quotation, having been deleted from the findings, should be and is to be disregarded as a part of our decision. However, we add, as our own conclusion from the evidence, that the amount of personal service rendered by Mr. Tracy in the bankruptcy matters in question did not measure up in amount or quality to that required of a lawyer in his position.

Except as above indicated, the petition is denied.

DEVANEY, CHIEF JUSTICE, took no part in the consideration or decision of this case.