# IN RE DISBARMENT OF WALTER E. QUIGLEY.[1]

July 21, 1939.

No. 30,734.

*Oscar G. Haugland,* for State Board of Law Examiners.
*Elwood Fitchette* and *D. J. Shama,* for respondent.

PER CURIAM.

The state board of law examiners has petitioned this court to discipline Walter E. Quigley, a member of this bar, accusing him of violation of professional ethics in various matters.

The principal charges against Quigley relate to alleged misconduct in relation to matters within the jurisdiction of the federal district court and to the lending of his name to a corporation and to a disbarred attorney in furtherance of a systematic scheme for the solicitation of professional law business, the purpose of which was to exploit necessitous debtors on the one hand and unfortunate creditors on the other. In the latter accusation Quigley is charged with having received a minor portion of the fees collected by the corporation for the use of his name in what amounted to unauthorized practice of the law.

Quigley was born in East Grand Forks in the year 1890; he attended Carlton College and the University of North Dakota and was admitted to the bar of North Dakota in 1912. He appears to

[1]Reported in 287 N. W. 105.

have practiced in Grand Forks until the summer of 1916, when he became an organizer for the Nonpartisan League in Minnesota. During the winter of 1916 and 1917 he was engaged in the reorganization of the Nonpartisan League in North Dakota, and from 1917 to 1920 he worked with the League in Nebraska. In 1921 he was admitted to the bar of this state on motion without examination. He was also admitted to practice in the federal district court. Since 1926 he has had no office from which to conduct his law practice, but has frequented a law office at 419 Metropolitan Bank Building in Minneapolis. Since 1926 he has been chiefly active in politics. In that year he was disbarred by the federal court for this district for attempting to extort $1,250 from Ned Welch, a Minneapolis druggist, by the process known to the underworld as a "shakedown." He represented that federal prohibition agents had evidence of illegal sales of intoxicating liquor by Welch and that he, Quigley, could arrange with the agents to have the evidence of the violations destroyed. The charge against him in the federal court was based on a report from the Internal Revenue Service which read as follows:

"On June 5, 1925, Mr. Quigley attempted to extort money by this device from one Ned Welch, who at that time owned and operated, and still maintains, a drug store at 315 East Franklin Avenue, Minneapolis, Minnesota. According to Mr. Welch, Walter Quigley came to this drug store about 10:30 A. M., June 5, 1925. Quigley was accompanied by another man not known to Mr. Welch, but who, from description, is probably Edward Corneaby,[2] a former Prohibition Agent, or his brother, Frank Corneaby. Quigley introduced himself, presented a card, and asked to speak to Mr. Welch confidentially. Mr. Welch conducted his callers into the prescription booth. There Quigley told him that Federal Prohibition Agents had made several purchases of liquor from him and that affidavits of these illegal sales, as well as the bottles of liquor purchased, were in the Federal Prohibition Director's office, and that the Government had a strong case against him. Representations were made

[2] There is no direct testimony in the record connecting Edward Corneaby in any way with Quigley's acts.

that a Prohibition Agent who made the purchases was about to leave the service, and would be able to secure the affidavits from the files and to remove the liquor held as evidence as well, thereby destroying the Government's case. This would be done if Mr. Welch gave Quigley $1,000.00 to pay the dishonest agent and $250.00 additional as attorney's fees for Quigley. If Mr. Welch did not turn over the money he was assured that he would be convicted on the charge and sentenced to the penitentiary at Leavenworth. Welch protested his innocence, but Quigley and his accomplice persisted and finally an appointment was made at 5 P. M. on the same day, at which time the matter would be discussed further. Quigley came back to the store alone about 1:30 P. M., while Welch was absent, and Mrs. Ned Welch, his wife, was in charge. He broached the subject to her and suggested that it would be better to part with $1,000.00 than to have Mr. Welch go to the penitentiary. About 3:00 P. M., Quigley again returned, had a short conversation with Welch and renewed the arrangement to meet Welch at 5:00 P. M. Mr. L. S. Grossman, of the Grossman, Kimball Company, Minneapolis, was in the store at the time and heard enough of the conversation between Quigley and Welch to conclude that Quigley was attempting to extort money from Welch over a liquor deal. When Quigley left Mr. Grossman and Mr. Welch talked the matter over and decided to notify the Federal Prohibition Director's office. Mr. Welch went to the Federal Building and told the story of Quigley's proposal and returned with Prohibition Agents Joseph N. Riddle, J. Scott Cash, and Harvey B. Bortel. The officers concealed themselves in the store to await the return of Quigley. At 5:00 P. M., he came and went into the prescription booth with Mr. Welch. He refused to accept a proffer of money there and asked Welch to come outside in his automobile where he could talk things over and receive the money. Quigley was arrested by the Prohibition Agents as he was leaving the store and placed in the Minneapolis City Jail. He refused to make any statements."

Other charges were contained in the Internal Revenue Service's report, but the information filed against Quigley was based on the

Welch matter. In response to these charges Quigley offered no objection to his disbarment but asked that his name be stricken from the roll of attorneys permitted to practice in the federal court. Accordingly he was disbarred by that court. Why no disbarment proceedings were initiated in this court is wholly unexplained except by the inference that disbarments in the federal courts were not reported to this court or to the bar association.

In 1932 Quigley sought reinstatement to the bar of the federal court upon an assertion by him that he had, since the date of his disbarment, participated in only five matters of minor importance in the state court and two matters in the United States district court, where he said that he had appeared "as agent and not as attorney" for the people that he represented. The federal court referred the matter to the United States attorney for investigation, and he reported the evidence gathered by the federal officers in connection with the attempt at "shaking down" Welch and others. He also communicated with the state bar association officials, who had no information of any misconduct by Quigley and consequently made no objection to his reinstatement. Upon this showing the federal court reinstated him on its roll of attorneys. His attempt to shake down the druggist is now referred to by him as a "rash act." If true (and certainly no lawyer would, as Quigley did, in effect admit the charge if it were not true or if he had any reason to expect an acquittal), his conduct amounted to the grossest moral turpitude, conduct far more reprehensible than highway robbery. It fully demonstrated his unfitness to honestly represent clients or to have the confidence of the courts.

We now come to his conduct in the Pro Rata Finance Corporation matter and with the disbarred attorney, W. E. Gibbons, now apparently known as Fitzgibbons. It appears that the Pro Rata Finance Corporation operated in the city of Minneapolis and advertised its services to necessitous debtors to whom it sometimes made loans at high rates of interest. It endeavored to prorate to creditors periodical payments from the earnings of its debtor clients. In cases where the creditors would not consent to the prorating arrangement it put the debtors through bankruptcy in the manner herein-

after described. The Collection Finance Company, with common officers, directors, and stockholders, occupied the same offices as the Pro Rata. It engaged in a collection business, in some cases purchasing accounts against the clients of the Pro Rata Finance Corporation. Pro Rata, in taking applications from its clients, required them to fill out a detailed questionnaire which furnished it with information very useful to its officers in their capacity as officers of the Collection Finance Company, which upon this information proceeded to obtain for collection the claims of creditors of the Pro Rata clients. In some cases it purchased desirable claims. It will thus be seen that the gentlemen who organized these corporations sought to exploit unfortunate creditors as well as the necessitous debtors. Pro Rata employed on a commission basis W. E. Gibbons, a disbarred attorney who was a brother-in-law of Quigley and with whom Quigley seems to have been upon very intimate terms. Quigley, of course, knew that Gibbons had been disbarred. Gibbons often advised debtors who came to Pro Rata's office that bankruptcy was the only course through which relief could be found. In at least nine specific instances Quigley is charged with improper conduct in connection with the bankruptcy proceedings of Pro Rata's clients. Typical is the case of Ellis Engle. Engle, in financial difficulty, sought out the Pro Rata corporation after reading one of its advertisements in a local paper. At its office he met Gibbons, who advised him that he was an expert in bankruptcy matters and that Engle should eliminate his creditors by such a proceeding. Engle signed the schedules prepared for him. In the inquiry as to who prepared the petitions and schedule, Quigley was asked:

Q. "Are you satisfied, so far as your recollection goes, that you did not prepare the schedules and petitions in the Engle matter?

A. "I don't believe I typed out the petition and schedule in any of those matters."

Engle testified that these papers were prepared by Gibbons while he waited in Pro Rata's office. Quigley was not there at the time. Yet it is his claim that the papers were drawn under his supervi-

sion and that Gibbons' part was merely clerical. We do not think the evidence warrants such a conclusion. When asked if the petitions and schedules were executed in his presence, Quigley testified that he did not know. Nor did he ever examine the papers before they were filed. In addition, when asked: "In preparing the petition and schedules in bankruptcy is it not necessary to ascertain whether or not some claims should be made on exemptions?" he stated, "Well, as I recall that, eventually Gibbons brought it to me and I determined that." We think the testimony of disinterested witnesses and the clear inferences drawn from all the record show that Gibbons did far more than mere clerical work. In all these cases he seems to have acted as the attorney functioning in the case, merely using Quigley's name on the papers. We are satisfied that he actually handled the Engle case except for the minor participation undertaken by the respondent at the creditors' meeting.

A note for $150 was executed by Engle to cover the cost of the bankruptcy. To whom it was payable is not undisputed. Engle testified that it was payable to Pro Rata while other witnesses testified that Quigley was the payee. Engle testified that Gibbons drew the instrument and that it was executed under his direction. He never met Quigley until the day of the creditors' meeting. There was never any discussion between Quigley and Engle as to fees. Quigley testified that "Mr. Gibbons came over and talked to me and I told him; * * *." Yet we are told by Engle that the note was drawn by Gibbons and executed at the same time the other papers were. If this is so, then Gibbons could not have "come over and talked" to Quigley in advance of the actual determination of the fee charge in the Engle case by Gibbons.

All payments on the note were made directly to Pro Rata, and receipts on their printed blanks were given. Quigley endeavors to explain this by saying that Pro Rata purchased the note from him at a discount.

Enlightening also is the fact that Quigley did not recall many of the essential facts connected with the Engle case which seem to be of a character likely to be remembered by one who supervised the transactions. For instance, Quigley did not recall whether he drew

the assignment of wages for security, but stated: "That I don't recall, whether I drew it or whether Fitzgibbons drew it. I drew some assignments in those cases." Likewise he did not recollect whether he asked Engle for the wage assignment or the mortgage on his automobile.

The only legitimate inference that can be drawn from the evidence is that Pro Rata and its agent, Gibbons, drew the petitions and schedules and determined their contents, advanced the costs, and received a substantial portion of the $150 paid on the note executed by Engle, who was attracted to the offices by advertisement. The records of the corporation show that in the Engle matter there were the following disbursements:

| | |
|---|---|
| Clerk's fees - - - - - - - | $30.00 |
| Publication fees - - - - - | 12.00 |
| Schedules - - - - - - - - | 1.00 |
| Quigley - - - - - - - - | 40.00 |
| | —————— |
| | $83.00 |

Quigley obtained $40 for the use of his name and for such services as he rendered. This was by check drawn by Pro Rata in his favor. Pro Rata in all received nearly $75 in profit from which Gibbons, who operated on a commission basis, must have received a portion. Yet, despite the fact that Pro Rata made all the advancements, Quigley filed an affidavit and a verified petition in the bankruptcy proceeding in which he stated he had advanced $42 on behalf of the bankrupt.

We are urged to believe that the sale of the note was *bona fide* and that part of the consideration was the money advanced for the costs in the bankruptcy. We cannot accept this explanation. Our conclusion from the entire record is that the "sale" of the notes was merely a device to make it appear that Quigley was not splitting fees or procuring money for what reduces itself to substantially the sale of the use of his name as a member of this bar. This all becomes clearer if we consider another typical case.

Adrian C. Hames, a debtor, read Pro Rata's newspaper advertisement and made inquiry through the mail. Gibbons came to see him, and a prorating agreement was entered into. Some of the creditors being dissatisfied, Hames was threatened with garnishment. Worried about this, he sought out Gibbons at his home. By coincidence Quigley was also there. Bankruptcy was decided upon as the best course for Hames to pursue. Petitions and schedules were drawn up and signed by Hames. Quigley did not draw these. Hames assigned his wages in the sum of $70 to Quigley "to reimburse him for clerk's and referee costs and indemnity fee advanced by him in filing this petition and balance for attorney fees." Two $50 notes, made on the forms of the Pro Rata corporation, were executed, payable to Quigley. One was for attorney's fees and the other for case outlay. L. A. Sauer, an officer of Pro Rata, testified that the money advanced by Pro Rata on one of the notes covered the $30 filing fee paid in the Hames bankruptcy, $10 referee's fee, and $10 discharge fee. Payment in full has been made on these two notes, in each instance to Pro Rata, although Hames still owes Pro Rata money on subsequent transactions.

Quigley did not pay the costs, fees of the referee, or other expenses in the Hames bankruptcy. They were paid directly by Pro Rata. He further testified that he received only $15 on the Hames case, this by the "sale" of one of the notes to Pro Rata. The record shows that Gibbons filed the petition and schedule. Quigley did not appear in any of the proceedings. The important and essential work in connection with the Hames bankruptcy was that of Gibbons.

Again we are asked to believe that the notes were sold to Pro Rata and that the advances were in legal effect actually made by Quigley and that any profit made by Pro Rata was a legitimate profit upon the discounted note rather than part of respondent's fees. The testimony shows a situation more involved than that. There are before us a series of similar transactions typified by the Engle and Hames cases which all follow the same fundamental pattern. Each transaction characterizes the others. Despite denials, it satisfactorily appears that there was a connection, arranged

through Gibbons, who acted as intermediary, between Pro Rata and Quigley which resulted in his obtaining legal business through the solicitation of Pro Rata and Gibbons. Likewise, the sale of the notes was not *bona fide* but simply a method to conceal the real character of the transaction. To be severely condemned is the fact that respondent benefited by the lending of his name to those whom he knew were engaging in the unauthorized practice of law. It is still more reprehensible that he benefited financially from the lending of his name to the practice of law by the disbarred Gibbons. His association with a lawyer adjudged to be unfit to be entrusted with the affairs of clients was in itself calculated to bring the profession into disrepute. Quigley is too intelligent a man not to be aware of the methods by which these cases were obtained and of the fact that in the series of cases Gibbons was actually performing the functions of an attorney by using Quigley's name. His answers to inquiries addressed to matters about which he should have been well informed, if his relations with clients were what he would have us believe, were too conveniently vague and indefinite to carry conviction. It was his duty to be frank and candid, and his testimony indicates that he was far from being so.

The evidence fully justifies us in concluding that Quigley knowingly lent his name to the furtherance of the scheme by these two corporations in the systematic solicitation of business the purpose of which was to exploit the necessitous debtor on the one hand and the unfortunate creditor on the other. How we regard this scheme is fully set forth in In re Disbarment of Tracy, 197 Minn. 35, 266 N. W. 88, 267 N. W. 142. In effect the corporation and Gibbons practiced law in Quigley's name. He apparently functioned only when it was necessary to go before the referee or into court. The corporation got the business and financed the operation, paying Quigley a minor part of the fee for the use of his name. The findings of the referee and our conclusions as to Quigley's relations with Pro Rata and with Gibbons are further supported by the fact that in 1936 officers of the Hennepin County Bar Association sought an injunction against Pro Rata and Gibbons to restrain them from the unauthorized practice of law and against Quigley and others

from aiding and abetting such practice. Quigley finally consented in open court to findings which fully determined all issues against him. He says that he had, prior to the injunction proceedings, forbidden Pro Rata and Gibbons to use his name in their matters, but the plaintiffs, claiming to be fully prepared to prove their complaint, refused to accept a consent decree upon any other assumption than the truth of all charges. Quigley consented to this. Certainly he would not have done so if he had had a defense.

We are convinced that Quigley's whole record compels a finding that he is wholly lacking in the moral fiber necessary to sustain a lawyer in the practice of his profession and against the temptations inevitably confronting a lawyer in the field which he has chosen. He has been guilty of such vicious and unethical practices that we must disbar him from practice in the courts of this state. Let a copy of this opinion and order be transmitted to the clerk of the United States court for this district.

Let judgment of disbarment be entered.

MR. JUSTICE HILTON, being incapacitated by illness, took no part.