[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-11675

_____

CHARLES WILDES, et al.,

Plaintiffs,

ALBERT PARKS,
FARAMARZ SHEMIRANI,
CORY STRUZAN,
MARYANN MARRYSHOW,
MIJA YOO,
NELSON ARIAS,

Plaintiffs-Appellants,

PAUL LONG, et al.,

Consolidated Plaintiffs,

2                    Opinion of the Court                    20-11675

*versus*

BITCONNECT INTERNATIONAL PLC,
a foreign corporation,
BITCONNECT LTD.,
a foreign corporation,
BITCONNECT TRADING LTC.,
a foreign corporation,
GLENN ARCARO,
an individual,
TREVON BROWN,
an individual,
a.k.a. Trevon James, et al.,

                                        Defendants-Appellees,


NICHOLAS TROVATO, et al.,

                                        Consolidated Defendants.

—————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:18-cv-80086-DMM

—————————————

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

GRANT, Circuit Judge:

An online promotions team posted thousands of videos, all with a single aim: persuading people to buy BitConnect coin, a new cryptocurrency. But BitConnect coin wasn't a sound investment—it was a Ponzi scheme. After that scheme collapsed, BitConnect buyers sought to hold the promoters liable under section 12 of the Securities Act of 1933 for soliciting the purchase of unregistered securities.

The marketers insist that they cannot be held liable because the Securities Act covers sales pitches to particular people, not communications directed to the public at large. Not so—neither the Securities Act nor our precedent imposes that kind of limitation. Solicitation has long occurred through mass communications, and online videos are merely a new way of doing an old thing. Because the Securities Act provides no free pass for online solicitations, we reverse the district court's dismissal of the section 12 claim.

## I.

BitConnect and its promoters stoked public enthusiasm for a new form of cryptocurrency, the BitConnect coin. But as the plaintiffs tell it, each round of investors was simply paid back by the one that followed—with the promoters siphoning off money each

time.[1]  The story was that investors could buy BitConnect coins and then earn outsized returns without doing anything else.  In the "staking" program, for example, investors could earn up to 10 percent interest per month, guaranteed, just for holding their BitConnect coin in a virtual "wallet."  And in the lending program, investors lent their coins to BitConnect, which ostensibly traded them for profit.  BitConnect promised "lenders" extravagant earnings—not only fixed interest each day (as well as possible daily bonus interest) but also up to 40 percent interest at the end of each month.

Skeptics of this "opportunity" would be proven right.  The promised interest did not reflect growth in BitConnect's value, or result from traders' ability to beat the market by unthinkable margins.  BitConnect's original investors simply received their so-called returns from the money paid by new investors hoping for the same.

To keep this Ponzi scheme running, each round of investors required still more to follow.  That is where BitConnect's "multi-level marketing" structure came in, incentivizing each set of investors to draw in a new round of recruits.  "Promoters" encouraged others to sign up for BitConnect, and earned a commission on the investments that followed.  Some number of those recruits became promoters themselves, bringing in more

---

[1] For purposes of this appeal, we take those allegations as true.  *See Statton v. Florida Fed. Jud. Nominating Comm'n*, 959 F.3d 1061, 1062 (11th Cir. 2020).

investors.  A share of each investment would then pass on to the recruit's promoter, her promoter's promoter, and so on and so forth—a classic pyramid scheme.

Glenn Arcaro played a significant role in BitConnect's pyramid-on-Ponzi scheme.  He was the national promoter for the United States, which meant that he managed a team of regional promoters.  Together, the team created an extensive U.S. marketing scheme for BitConnect, which included multiple websites where Arcaro encouraged viewers to buy BitConnect coins.  At glennarcaro.com, for example, he told potential investors that passive income was merely "a click away"—all they needed to do was take "a few minutes" to join BitConnect.  At BitFunnel, he instructed investors to fill out a form to access a video about "how to make huge profits with BitConnect."  And at Futuremoney.io, Arcaro hosted a course called Cryptocurrency 101, which culminated in lessons on how to create a BitConnect account and how to transfer bitcoin there.  Arcaro also shaped his team's recruitment efforts, directing regional promoters to create videos about investing that always ended with a pitch for BitConnect.  Together, Arcaro and his team posted thousands of YouTube videos extolling BitConnect, and those videos were viewed millions of times.

Millions of views led to millions of dollars.  Just short of a year after the coin's introduction, BitConnect was bringing in around $7 million per week in investments from the United States.

And that was not the limit; the next month, BitConnect's weekly haul was more than $10 million.

All that money still could not sustain BitConnect's Ponzi scheme.  So as the year ended, BitConnect came up with another plan to reel in millions—and announced that it would offer another cryptocurrency, BitConnectx.  State regulators, however, had other ideas.  At the start of the new year, Texas issued an emergency cease and desist order, and North Carolina soon followed suit.  Within days, the scheme unraveled.  BitConnect closed its trading platform, and the value of its cryptocurrency plummeted; within "moments" its value fell by almost 90%.  Months later, the coin was worth only 40 cents—a 99.9% drop in value from the start of the year.

Two victims of the BitConnect collapse tried to recoup their losses, suing on behalf of themselves and a putative class of all persons who had lost money in BitConnect investments.  They alleged (among other things) that the promoters were liable under section 12 of the Securities Act for selling unregistered securities through their BitConnect videos.  15 U.S.C. § 77*l*(a)(1); *see id.* § 77e(a)(1).  Some of the promoters moved to dismiss, arguing that they were liable under the Securities Act only if they had offered or sold the plaintiffs a security.[2]  They had not done so, they asserted,

---

[2] The plaintiffs sued Arcaro and five regional promoters he managed:  Trevon Brown, Craig Grant, Ryan Hildreth, Ryan Maasen, and Tanner Fox.  The district court dismissed Grant from the suit because the plaintiffs failed to

20-11675                Opinion of the Court                7

because their videos did not "directly communicate" with the plaintiffs.

The district court agreed. It said that the plaintiffs needed to allege that the promoters had urged or persuaded them— "individually"—to purchase BitConnect coins. Because the plaintiffs based their case on interactions with the promoters' "publicly available content," the district court concluded that their complaint failed to state a section 12 claim. It also dismissed the remaining state-law claims against the promoters because jurisdiction for those claims was premised on a Securities Act violation.

The plaintiffs were given a chance to amend their complaint and did so, adding claimants who—unlike the original plaintiffs— had signed up for BitConnect directly through the promoters' referral links. The district court dismissed the amended complaint (and a similar one that followed) because the new plaintiffs, just like the old ones, had never received a "personal solicitation" from the promoters. This appeal followed.[3]

_____

timely serve him. The plaintiffs managed to serve the other promoters, but for reasons that are not clear from the record, only Arcaro and Maasen moved to dismiss the case.

[3] The plaintiffs appeal rulings contained in orders that also dismiss other claims against the promoters and YouTube, as well as unserved defendants. In their briefs, however, the plaintiffs challenge only the dismissal of their section 12 and state-law claims against the promoters. The plaintiffs therefore do not

8                    Opinion of the Court                    20-11675

## II.

We review de novo a dismissal for failure to state a claim. *Godelia v. Doe 1*, 881 F.3d 1309, 1316 (11th Cir. 2018).  In doing so, we accept the complaint's factual allegations as true and construe them in the light most favorable to the plaintiffs.  *Id.*

## III.

The only question here is whether a person can solicit a purchase, within the meaning of the Securities Act, by promoting a security in a mass communication.  Arcaro insists that liability follows only when a seller directs a solicitation to a particular prospective buyer.[4]  Mass communications, in his view, are never enough.  That rule would certainly go a long way toward eliminating liability for the promoters here, and for others who champion dicey investments through modern communication channels.  The problem for these promoters is that nothing in the Securities Act makes a distinction between individually targeted sales efforts and broadly disseminated pitches.

The Securities Act prohibits a person from using "any means or instruments of transportation or communication in interstate commerce" to sell an unregistered security.  15 U.S.C. § 77e(a)(1).  And to enforce the prohibition, section 12 of the Act authorizes

---

appeal the dismissal of their other claims—including their claim against YouTube and their claim against Arcaro under section 15 of the Securities Act.

[4] Arcaro was the only promoter to file a brief in this appeal.

buyers of an unregistered security to sue a person who "offers or sells" it. *Id.* § 77*l*(a)(1).

So what does it mean under the Act to offer or sell a security? In reverse order, a person sells a security when he makes a "contract of sale" for or disposes of a security for value. *Id.* § 77b(a)(3). And a person offers a security "every" time he makes an "offer to dispose of"—or a "solicitation of an offer to buy"—a security for value. *Id.*

Nowhere in those definitions does Congress limit solicitations to "personal" or individualized ones as the district court did here. In fact, the Act suggests the opposite. It makes a person who solicits the purchase of an unregistered security liable for using "*any* means" of "communication in interstate commerce." *Id.* § 77e(a)(1) (emphasis added); *see id.* § 77*l*(a)(1). Among those methods is "any prospectus"—which the Act defines to include communications as impersonal as radio and television advertisements. *Id.* §§ 77e(a)(1), 77b(a)(10).

Nor is the proposed limitation somehow baked into the word "solicitation." When Congress provided in 1933 that an offer included a "solicitation," that word meant something broader than Arcaro now contends. *See* Securities Act of 1933, Pub. L. No. 73-22, § 2(3), 48 Stat. 74, 74. Solicitation unsurprisingly entailed the "pursuit, practice, act, or an instance, of soliciting," and "solicit" meant "to approach with a request or plea, as in selling." *Webster's New International Dictionary of the English Language* 2393–94 (2d ed. 1938). And cases from that era show that a sales "approach" did

not need to be personal to amount to a solicitation. Rather, people understood solicitation to include communications made through diffuse, publicly available means—at the time, newspaper and radio advertisements. *See, e.g., Cochran v. United States*, 41 F.2d 193, 196–97 (8th Cir. 1930) ("solicitation" of securities purchases occurred "by means of divers newspaper advertisements"); *Horwitz v. United States*, 63 F.2d 706, 709 (5th Cir. 1933) (Sibley, J., concurring) ("radio communications" were "clearly solicitations"); *People ex rel. Chi. Bar Ass'n v. Goodman*, 366 Ill. 346, 348 (1937) (a "widespread plan of solicitation" included "advertisement in the telephone directory" and "radio announcements"); *In re Tracy*, 197 Minn. 35, 37 (1936) (attorney "solicited" clients "by advertisements in newspapers"); *Dvorine v. Castelberg Jewelry Corp.*, 170 Md. 661, 666 (1936) (defendant "continuously solicited" the public "by extensive advertisements inserted in the daily newspapers published in Baltimore City"). Under the text, then, a solicitation need not be "personal" to trigger liability. Broadly disseminated communications also can convey a solicitation—indeed, they are consistent with the longstanding interpretation of the term.

Moreover, and contrary to Arcaro's suggestion, Securities Act precedents do not restrict solicitations under the Act to targeted ones. The leading case interpreting section 12, *Pinter v. Dahl*, says nothing about what solicitation entails. 486 U.S. 622 (1988). It instead focuses on the result and intent necessary for section 12 liability: the solicitation must succeed, and it must be

motivated by a desire to serve the solicitor's or the security owner's financial interests. *See id.* at 647. Three years later, this Court touched on the meaning of solicitation. But we held only that, for solicitation to occur, a person must "urge or persuade" another to buy a particular security. *Ryder Int'l Corp v. First Am. Nat'l Bank*, 943 F.2d 1521, 1531, 1534 (11th Cir. 1991) (quotation omitted). We never added that those efforts at persuasion must be personal or individualized.

Technology has opened new avenues for both investment and solicitation. Sellers can now reach a global audience through podcasts, social media posts, or, as here, online videos and web links. But under the district court's cramped reading of the Securities Act, a seller who would be liable for recommending a security in a personal letter could not be held accountable for making the exact same pitch in an internet video—or through other forms of communication listed as exemplars in the Act, like circulars, radio advertisements, and television commercials. *See* 15 U.S.C. §§ 77e(a)(1), 77b(a)(10). That makes little sense. A seller cannot dodge liability through his choice of communications— especially when the Act covers "any means" of "communication." *Id.* § 77e(a)(1). We decline to adopt an interpretation that both contradicts the text and allows easy end-runs around the Act.

A new means of solicitation is not any less of a solicitation. So when the promoters urged people to buy BitConnect coins in online videos, they still solicited the purchases that followed. The

plaintiffs therefore have stated a section 12 claim against Arcaro and the other promoters.[5]

## IV.

Arcaro argues that the plaintiffs should nonetheless lose because they abandoned any challenge to an independent ground for dismissing their claim—namely, they did not allege that they had purchased the coins "as a result of" Arcaro's solicitations. Arcaro divines this alternative holding from a single sentence in the district court's order, which said that "the additional allegations" in the amended complaint "fail to allege that Plaintiffs purchased securities *as a result of* Arcaro's and/or Maasen's *personal* solicitation."

Though we do not see Arcaro's interpretation as the most obvious, that sentence, standing alone, might imply that the district court thought the plaintiffs did not allege that the promoters' videos had convinced them to invest. But the district court did not end there. It continued by explaining that the claim failed because the plaintiffs had not alleged that the promoters "engaged in active efforts to urge or persuade any of the Plaintiffs to invest in BitConnect." And the court focused at length on the plaintiffs'

---

[5] The district court also gave an alternative reason for dismissing any claims against Brown, Hildreth, and Fox—that the plaintiffs had failed to prosecute those claims. On appeal the plaintiffs have failed to raise, and thus abandoned, any challenge to that ground for dismissal. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). We therefore affirm the dismissal of the claims against those three defendants.

failure to allege that any promoter had "personally solicited" an investment. So the court dismissed the case because the solicitations weren't "personal," not because the solicitations didn't lead to the plaintiffs' purchases. Indeed, the district court recognized that the plaintiffs alleged that they had bought BitConnect coins "because of" the promoters' "recruitment efforts." We see no reason to read the district court's opinion as coming to a conclusion that is in tension with its own characterization of the complaint.

## V.

The plaintiffs also ask us to reinstate their state-law claims against the promoters. The district court dismissed those claims for lack of personal jurisdiction; the plaintiffs had premised jurisdiction on the Securities Act but (according to the district court) had not stated a claim under the Act. As explained above, though, the court incorrectly dismissed the section 12 claim. Its reason for holding that it lacked jurisdiction thus cannot stand.

★   ★   ★

When a person solicits the purchase of securities to serve his (or the security owner's) financial interests, he is liable to a buyer who purchases those securities—whether that solicitation was made to one known person or to a million unknown ones. Using publicly available videos, the promoters here—with Arcaro in the lead—convinced the plaintiffs to buy BitConnect through their referral programs and earned a commission on those investments.

14                    Opinion of the Court                    20-11675

We therefore **REVERSE** the district court's dismissal of the section 12 claim against Arcaro and Maasen; **VACATE** its dismissal of the state-law claims against them; **AFFIRM** its dismissal of any other claims and defendants in the orders appealed; and **REMAND** this case for further proceedings consistent with this opinion.