STATE of Minnesota, Appellant,

v.

Nathan OBETA, Respondent.

No. A10–1349.

Supreme Court of Minnesota.

March 24, 2011.

Lori Swanson, Attorney General, John Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, MN, for appellant.

Renée J. Bergeron, St. Paul, MN, for respondent.

Caroline S. Palmer, Sara G. Thome, St. Paul, MN, for amicus curiae Minnesota Coalition Against Sexual Assault.

Doug Johnson, Washington County Attorney, Sarah E. Kerrigan, Assistant County Attorney, Stillwater, MN, for amicus curiae Minnesota County Attorneys Association.

OPINION

DIETZEN, Justice.

Respondent Nathan Obeta was found guilty by a jury and convicted of first- and third-degree criminal sexual conduct, Minn.Stat. §§ 609.342, subd. 1(e)(i), and 609.344, subd. 1(c) (2010). On appeal, the court of appeals reversed Obeta's convictions based on the cumulative effect of several trial errors. *State v. Obeta* (*Obeta I*), No. A08–1419, 2009 WL 2596102 (Minn.App. Aug. 25, 2009), *rev. denied* (Minn. Nov. 17, 2009). On remand, appellant State of Minnesota requested a pretrial order from the district court allowing it to present expert-opinion evidence to rebut Obeta's defense that the sexual conduct with the complainant was consensual. The district court denied the State's request to admit this expert testimony at Obeta's second trial. The issue presented in this case is whether our decision in *State v. Saldana*, 324 N.W.2d 227 (Minn. 1982), operates as a blanket prohibition against the admission of expert testimony about typical rape-victim behaviors to re-

but a defendant's claim that the sexual conduct was consensual. Because we conclude that *Saldana* has been interpreted too broadly, we reverse the district court.

The parties do not dispute the facts of the alleged sexual assault as set out in the unpublished opinion from the court of appeals. *Obeta I*, 2009 WL 2596102, at *1–2. Briefly stated, Obeta and his friend met the complainant, M.B., and her friend for the first time on April 25, 2007, in Isanti, Minnesota. During the course of the evening, the police arrested Obeta's friend and impounded the car he was driving because its registered owner was not present.

After Obeta's friend was released from police custody, M.B. cajoled her ex-boyfriend into giving M.B. and the two men a ride to St. Paul. After spending the day collecting money for the impound lot fee, Obeta obtained the car from an impound lot near Isanti. M.B. asked Obeta if he would give her a ride home. Obeta agreed, but instead of driving her to her home in Isanti, Obeta drove M.B. and his friends to St. Paul. After dropping off his friends, Obeta parked the car in the parking lot of an apartment complex. M.B. testified that Obeta forced her to have sexual intercourse in the car.

Afterwards, M.B. went into an adjacent gas station to clean up in the bathroom. M.B. asked to use the phone, telling the attendant that she was stranded. M.B. failed to find a ride back to Isanti, so she went across the street and sat in a Taco Bell. Approximately two to three hours after the alleged assault, M.B. flagged down a patrolling police officer and reported that Obeta raped her. The police took M.B. to a hospital where a Sexual Assault Nurse Examiner (SANE) examined her.

At trial, Obeta admitted he had sex with M.B. but argued that it was consensual. During the trial, the State elicited testimony from the SANE nurse that M.B. did not suffer vaginal trauma, but that submissive behavior and lack of vaginal injury were not unusual in cases of sexual assault. The investigating police officer testified that, in her experience, most sexual assault victims delay reporting the crime. The jury found Obeta guilty of first- and third-degree criminal sexual conduct.

The court of appeals reversed Obeta's conviction for cumulative error and remanded for a new trial. *Obeta I*, 2009 WL 2596102, at *5–6. As part of this cumulative error, the court held the district court erred in admitting the testimony from the SANE nurse and the police officer regarding typical rape-victim behaviors because our decision in *State v. Saldana*, 324 N.W.2d 227, 229–30 (Minn.1982), prohibits such testimony. *Obeta I*, 2009 WL 2596102, at *3.

At a pretrial hearing on remand to the district court, the State sought to admit expert testimony on the subject of rape myths and typical rape-victim behaviors. The State presented testimony from Jeanne Martin, the director of the Victim Services Program for Dodge, Filmore, and Olmsted Counties, and Dr. Patricia Frazier, a professor of psychology at the University of Minnesota, and offered into evidence two recent journal articles by British researchers.

Both Martin and Dr. Frazier testified about typical behaviors of victims during and after a sexual assault. They said that it is uncommon for victims to fight aggressively against their rapist. They testified that most people who are sexually assaulted receive no physical injuries; that when they are injured, the most common injury is bruising on the thighs or arms from where the victim was held down; and that vaginal injuries are unusual. They further

explained that people who are sexually assaulted often delay reporting their attack.

Dr. Frazier also provided specific information about rape myths. She testified that rape myths are "beliefs about what rape is and what rape victims are" and "beliefs about how rape victims should be or should act." According to Dr. Frazier, "studies that look at rape myths show that they are common" and that "people who endorse more rape myths are less likely to believe a victim, more likely to hold the victim responsible, less likely to hold the perpetrator responsible, and less likely to convict a defendant." Dr. Frazier concluded her direct testimony with the following exchange:

> [STATE]: [I]s it your opinion from the research that you've done that the factors we've discussed—the delayed reporting, the lack of resistance, lack of injury, and the calm affect—is it your opinion that those factors impact the jury in its deliberation, or certainly can?
>
> [FRAZIER]: Yes.
>
> [STATE]: Is it your opinion that the general public lacks information or an informed knowledge about the range of behaviors that a person might experience after a sexual assault?
>
> [FRAZIER]: Yes.

The State offered two articles examining a mock-juror study by British researchers Drs. Louise Ellison and Vanessa Munro. *See* Louise Ellison & Vanessa E. Munro, *Turning Mirrors into Windows?: Assessing the Impact of (Mock) Juror Education in Rape Trials*, 49 Brit. J. Criminology 363 (2009); and Louise Ellison & Vanessa E. Munro, *Reacting to Rape: Exploring Mock Jurors' Assessments of Complainant Credibility*, 49 Brit. J. Criminology 202 (2009). The researchers in the mock-jury study manipulated the evidence presented during the mock trial to study jurors' reactions to the sexual-as-sault victim's delayed reporting, flat affect on the witness stand, and lack of physical injury. Ellison & Munro, *Reacting to Rape, supra*, at 204–05. Additionally, the researchers provided jurors with educational information about typical rape behaviors through either expert testimony or a jury instruction. *Id.*

Drs. Ellison and Munro examined the deliberations of the groups that did not receive any educational information to determine whether the mock jurors subscribed to rape myths. Ellison & Munro, *Reacting to Rape, supra*, at 206. They found that mock jurors' "commitment to the belief that a 'normal' response to sexual attack would be to struggle physically was, in many cases, unshakeable." *Id.* Additionally, jurors harbored "strong, but unfounded, convictions that vaginal tissues are easily torn, that pelvic muscles can be rigidified at will and that intercourse without trauma only occurs where a woman is aroused, which, in the jurors' minds, was wholly inconsistent with rape." *Id.* at 207. The study also yielded support for the proposition that jurors view delayed reporting as indicative of a fabricated report, although the jurors were receptive to the idea that a victim may delay reporting for other reasons. *Id.* at 209–10.

The district court denied the State's motion to admit the proffered expert testimony. The court made no findings about the proffered testimony but instead explained that it was denying the motion, in part, because of current Minnesota case law on the admission of expert testimony regarding typical rape-victim behaviors. The State appealed the order to the court of appeals and, while that appeal was pending, we granted the State's petition for accelerated review.

I.

■ Initially, we must decide whether the State's pretrial appeal of the district

court's order denying its request to offer expert testimony on typical rape-victim behaviors should be reviewed by the court. The State argues that the district court's order precluding it from offering expert testimony on typical rape-victim behaviors will have a critical impact on its ability to prosecute Obeta. Essentially, the State urges that we overturn our decision in *State v. Saldana,* 324 N.W.2d 227 (Minn. 1982), and allow such expert testimony to help explain certain facts in the case that are relevant to the issue of consent, such as delayed reporting of the incident, lack of physical injuries, and submissive behavior during the alleged assault.

 In Minnesota, we allow pretrial appeals by the State if they meet certain requirements. *State v. Underdahl,* 767 N.W.2d 677, 681 (Minn.2009); Minn. R.Crim. P. 28.04. One requirement is the critical-impact rule. *State v. Lessley,* 779 N.W.2d 825, 831 (Minn.2010). In order for an appellate court to review a pretrial order, the State must show that the district court's ruling will have a critical impact on its case. *Underdahl,* 767 N.W.2d at 681; Minn. R.Crim. P. 28.04, subd. 2. A district court's order suppressing evidence will have a critical impact on the State's ability to prosecute the defendant if "the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution." *State v. Joon Kyu Kim,* 398 N.W.2d 544, 550–51 (Minn.1987).

We need not decide whether the State has shown critical impact.[1] In prior cases, we have decided the underlying issues in the appeal without first determining whether critical impact was established. For example, in *Lessley,* we chose to exercise our inherent authority to hear the State's pretrial appeal in the interests of justice when the case involved the important constitutional issue of whether the State needed to consent before a defendant waived his or her right to a jury trial. 779 N.W.2d at 832; *see also State v. Kromah,* 657 N.W.2d 564, 566 (Minn.2003) (exercising inherent authority to hear the State's pretrial appeal in consolidated cases regarding the admissibility of DNA evidence without deciding whether the State had shown critical impact).

 Our inherent authority to hear an appeal in the interests of justice comes from Minn. Const. art. VI, § 2, which states that this court has "appellate jurisdiction in all cases." *See Vang v. State,* 788 N.W.2d 111, 114 (Minn.2010). We have interpreted this constitutional provision "as granting us 'constitutionally independent authority to review determinations by the other state courts.'" *Id.* (quoting *State v. Wingo,* 266 N.W.2d 508, 511 (Minn.1978)). Additionally, we have "[i]nherent judicial power" that "grows out of express and implied constitutional provisions mandating a separation of powers and a viable judicial branch of government." *In re Clerk of Lyon Cnty. Courts' Comp.,* 308 Minn. 172, 180, 241 N.W.2d 781, 786 (1976); *see also State v. Willis,* 332 N.W.2d 180, 184 (Minn.1983). Our inherent judicial power includes the power to "enable [the court] to administer justice

---

1. The dissent contends that "our jurisdictional rules are binding, and we have no authority to bypass them whenever we see fit" and that "[w]hen there is a clear jurisdictional rule on point, such as Minn. R.Crim. P. 28.04, subd. 2, that should be the end of our inquiry" regarding whether there is jurisdiction for an appeal. As our decisions in *Lessley,* 779 N.W.2d at 832, and *State v. Kromah,* 657 N.W.2d 564, 566 (Minn.2003), clearly demonstrate, this court has the authority to consider a pretrial appeal brought by the State even if critical impact has not been shown. To the extent the dissent contends, however, that the inquiry into whether the court may consider a State's pretrial appeal should end if Minn. R.Crim. P. 28.04, subd. 2, is not met, that argument is refuted by *Lessley* and *Kromah.*

whether any previous form of remedy has been granted or not."[2] *In re Greathouse*, 189 Minn. 51, 55, 248 N.W. 735, 737 (1933).

Moreover, we have the inherent judicial authority to regulate and supervise the rules that govern the admission of evidence in the lower courts. *See State v. McCoy*, 682 N.W.2d 153, 160 (Minn.2004); *Willis*, 332 N.W.2d at 184; *In re Tracy*, 197 Minn. 35, 46–47, 266 N.W. 88, 93 (1936), *as modified by* 197 Minn. 35, 267 N.W. 142. We have relied on our "supervisory power to insure the fair administration of justice" to decide important evidentiary issues with statewide impact. *See State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994); *State v. Lefthand*, 488 N.W.2d 799, 801–02 (Minn.1992).

We are convinced that the district court and the court of appeals are routinely interpreting *Saldana* as a blanket prohibition against the admission of expert testimony on typical rape-victim behaviors in adult criminal sexual conduct cases.[3] As set forth below, this interpretation is a misapplication of *Saldana*. A large number of criminal sexual conduct cases are prosecuted in Minnesota each year; frequently, the defendant asserts that the complainant consented to the sexual conduct. Without clarification from this court, the prevailing interpretation by the lower courts that *Saldana* categorically bars the State from presenting expert testimony on typical rape-victim behaviors will continue to apply, and the State will be precluded from presenting expert testimony. Given the prosecution's narrow opportunities to appeal in criminal cases, there is a significant likelihood that the evidentiary question presented here will evade review by this court.[4] Under these circumstances, when our precedent is being misapplied in a large number of cases on an important issue of statewide concern, we conclude that this case warrants exercise of our supervisory power to ensure

**2.** The dissent contends that we have carved out a "novel" jurisdictional standard in this case. It is hard to see how relying on the court's inherent judicial authority to provide a jurisdictional basis for this appeal is novel. We have recognized the court's inherent judicial authority for more than 70 years. *See Greathouse*, 189 Minn. at 55, 248 N.W. at 737.

**3.** *See, e.g., State v. Myers*, 359 N.W.2d 604, 610 (Minn.1984); *State v. McGee*, 324 N.W.2d 232, 233 (Minn.1982); *Obeta I*, 2009 WL 2596102, at *3; *State v. Morales–Mulato*, 744 N.W.2d 679, 687–88 (Minn.App.2008), *rev. denied* (Minn. Apr. 29, 2008); *State v.·Larson*, No. C8–93–179, 1993 WL 412998, at *2–3 (Minn.App. Oct. 19, 1993), *rev. denied* (Minn. Dec. 14, 1993); *State v. Ross*, No. C3–92–1469, 1993 WL 173896, at *1 (Minn.App. May 25, 1993), *rev. denied* (Minn. June 22, 1993); *State v. Carlson*, 360 N.W.2d 442, 442–43 (Minn.App.1985).

**4.** The dissent takes issue with our conclusion that the important issue raised in this case will likely evade review. As support, the dissent notes that this court had the opportunity to review the issue presented in this case in *Obeta I*. In *Obeta I*, no record was developed at the district court regarding whether *Saldana* should be interpreted to prohibit expert testimony on counterintuitive rape-victim behaviors. Specifically, no expert testimony was presented on the need to counter rape myths through expert testimony on counterintuitive rape-victim behaviors. As a result, it is unlikely the issue could have been resolved upon review of *Obeta I*. The dissent also notes that the Minnesota County Attorneys Association's amicus brief referred to one prosecutor who has been able to elicit, without objection from defendants, testimony from sexual assault nurses that "there is no typical reaction to a sexual assault, and that it is 'not uncommon' that an individual would suffer no physical injury or delay reporting." The dissent contends "[a] conviction based on such testimony would presumably provide us with jurisdiction to decide the exact question presented here." Such a case, however, would likely suffer from the same problems as *Obeta I* as there would be no need to develop an adequate record in the district court if the defendant does not object to the testimony.

the fair administration of justice to address this evidentiary issue.

## II.

Essentially, the State presents three arguments to support overturning *Saldana*. First, the State argues that *Saldana* was decided in 1982 and thus "predates most of the social-science literature on rape-victim behavior." Second, the broad language of *Saldana* is inconsistent with subsequent decisions from this court regarding expert testimony on typical posttraumatic behaviors. Last, most states have rejected a per se rule prohibiting the admission of expert testimony on typical rape-victim behaviors. Obeta argues that these reasons are insufficient to overturn *Saldana* and asserts that *Saldana* should stand because: (1) it provides a clear rule that is easy for district courts to follow; (2) it is consistent with cases excluding expert testimony from social scientists; and (3) it comports with Minn. R. Evid. 702 and 403.

The question of whether to overrule precedent is a legal one that is subject to de novo review. Pursuant to stare decisis, we adhere to former decisions to promote stability in the law. *Woodhall v. State,* 738 N.W.2d 357, 363 (Minn.2007) (citing *Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 406 (Minn.2000)). Stare decisis, however, is not an inflexible rule of law; rather, it is a doctrine of legal policy. *Oanes,* 617 N.W.2d at 406. As such, we may consider overruling precedent when the petitioner presents a compelling reason to abandon precedent. *State v. Lee,* 706 N.W.2d 491, 494 (Minn.2005).

Before addressing the merits of the State's arguments, we note that the State presented expert testimony on a wide range of typical rape-victim behaviors in the district court. The State concedes, however, that a large part of this testimony is irrelevant to the behaviors M.B. exhibited during and after the alleged rape.[5] The State further concedes in its briefs that it "is not arguing that unlimited expert testimony" on typical rape-victim behaviors "is admissible in every rape trial." Instead, the State indicated that it is seeking to introduce expert testimony in this case on the typicality of delayed reporting, lack of injuries, and the failure to fight back by sexual-assault victims. As a result, we will limit our discussion in this case to whether *Saldana* allows expert opinion testimony on these specific behaviors—delayed reporting, lack of physical injuries, and submissive conduct during the alleged assault—that the State claims are typical of how victims respond to a sexual assault.

### A.

The admissibility of expert testimony is governed by Minn. R. Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The opinion must have foundational reliability. In addition, if the opinion or evidence involves novel scientific theory, the proponent must establish that the underlying scientific evi-

---

**5.** For example, in addition to typical rape-victim behaviors that were summarized earlier in this opinion, Martin offered testimony about a phenomenon called "frozen fear," the effects of trauma on memory, and the long-term psychological and social effects of sexual assault. Dr. Frazier testified that sexual assault is considered a traumatic event sufficient to trigger posttraumatic stress disorder.

dence is generally accepted in the relevant scientific community.

Under this rule, expert testimony is admissible if: (1) the witness is qualified as an expert; (2) the expert's opinion has foundational reliability; (3) the expert testimony is helpful to the jury; and (4) if the testimony involves a novel scientific theory, it must satisfy the *Frye–Mack* standard. Minn. R. Evid. 702; *see Goeb v. Tharaldson*, 615 N.W.2d 800, 809–10 (Minn.2000) (articulating the *Frye–Mack* standard). At issue in this appeal is whether evidence of typical rape-victim behaviors is helpful to a jury.

■ Expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Minn. R. Evid. 702. "[E]xpert testimony is not helpful if the expert opinion 'is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions.'" *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn.2010) (quoting *State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980)). We recognize that "[a]n expert with special knowledge has the potential to influence a jury unduly." *State v. Grecinger*, 569 N.W.2d 189, 193 (Minn. 1997). We relied on these principles in *Saldana* when we held that "it was reversible error for an expert to testify concerning typical post-rape symptoms and behavior of rape victims." 324 N.W.2d at 232.

### B.

■ We next turn to whether *Saldana* bars the expert testimony offered by the State. In *Saldana*, the defendant appealed his conviction for first-degree criminal sexual conduct. 324 N.W.2d at 229. At trial, Saldana conceded that he had sex with the complainant, but argued that it was consensual. *Id.* The State called Lynn Dreyer, a sexual assault victim coun-selor, as an expert witness. *Id.* Dreyer testified to the following: (1) the psychological stages that a rape victim typically goes through after an assault; (2) the psychological symptoms Dreyer observed the complainant suffering during ten weeks of counseling; (3) that it is not unusual for a victim to delay reporting; and (4) that in her expert opinion, the complainant had not fantasized or lied about the assault and was a victim of acquaintance rape. *Id.* We framed the issue broadly, stating: "The issue is whether admission of testimony concerning typical post-rape symptoms and behavior of rape victims, opinions that [the complainant] was a victim of rape, and an opinion that [the complainant] did not fantasize the rape was reversible error." *Id.*

Acknowledging that expert testimony is admissible under Minn. R. Evid. 702 when it is helpful to the jury, we said: "If the jury is in as good a position to reach a decision as the expert, expert testimony would be of little assistance to the jury and should not be admitted." *Saldana*, 324 N.W.2d at 229. When we applied this standard to the proffered expert testimony, we focused solely on Dreyer's discussion of the "stages a rape victim typically goes through" and concluded that such testimony "was essentially an explanation of 'rape trauma syndrome.'" *Id.* We held that this testimony was not helpful to the jury because it was not necessary for the complainant to show that she experienced "typical post-rape symptoms ... to convince the jury that her view of the facts [was] the truth." *Id.* We stated that "rape trauma syndrome [had] not reached a level of reliability that surpass[ed] the quality of common sense evaluation present in jury deliberations." *Id.* at 230. Therefore, "[p]ermitting a person in the role of an expert to suggest that because the complainant exhibits some of the symptoms of

rape trauma syndrome, the complainant was therefore raped, unfairly prejudices the [defendant] by creating an aura of special reliability and trustworthiness." *Id.* We held that Dreyer's testimony about rape trauma syndrome, her ultimate-issue testimony that the complainant was raped, and her opinion that the complainant was credible were inadmissible. *Id.* at 230–31.

As noted above, both the district courts and the court of appeals have interpreted *Saldana* as creating a blanket prohibition against all expert testimony of typical rape-victim behaviors as not helpful to the jury under Minn. R. Evid. 702. We acknowledge that there is language in *Saldana* suggesting that any expert testimony on typical behaviors of sexual-assault victims should be excluded as a matter of law. The State urges us to overturn *Saldana* and allow expert testimony on typical behaviors of sexual-assault victims that are outside the common knowledge of jurors. But we need not decide whether *Saldana* should be overruled. Instead, we reject the broad reading of *Saldana* as applied by the district court in this case.

A careful reading of *Saldana* reveals that our analysis of the expert testimony about "typical post-rape symptoms and behavior of rape victims" focused solely on rape trauma syndrome. *See* 324 N.W.2d at 229–31. We did not specifically address Dreyer's testimony that delayed reporting was commonplace, *see id.,* presumably because in 1982 there was no principled distinction between rape trauma syndrome and "typical post-rape symptoms and behavior of rape victims," such as delayed reporting, *id.* But current social science

does distinguish between these two phenomena.

"Rape trauma syndrome" is a term coined in 1974 by two practitioners—not researchers—to describe what they observed to be "a two-phase recovery process of the victims [of rape] to integrate the event and recover." Jane Campbell Moriarty, *Wonders of the Invisible World: Prosecutorial Syndrome and Profile Evidence in the Salem Witchcraft Trials,* 26 Vt. L.Rev. 43, 97 (2001). Essentially, rape trauma syndrome describes a rape victim's recovery or healing process.[6]

Rape myths and counterintuitive rape-victim behaviors, on the other hand, are not counseling tools used in the recovery or healing process. Instead, they involve behaviors and beliefs that social scientists have observed. Rape myths are "prejudicial, stereotyped, or false beliefs about rape, rape victims, and rapists." Amy M. Buddie & Arthur G. Miller, *Beyond Rape Myths: A More Complex View of Perceptions of Rape Victims,* 45 Sex Roles 139–40 (2001) (citation omitted). Typical rape-victim behaviors are common behaviors and mental reactions social scientists repeatedly observe in rape victims, such as delayed reporting, lack of physical injuries, or the failure to fight aggressively against the attacker, that are contrary to society's expectations of how a person who was sexually assaulted would behave. *See* Moriarty, *supra,* at 98.

Unlike the experts in *Saldana,* the State's experts in this case will not testify about the purported stages of rape trauma syndrome or opine that M.B. suffers from

---

6. Dr. Frazier testified that rape trauma syndrome is "not a term that has a clear definition" and in that respect, can be analogized to the empty term "nervous breakdown." Social science literature supports this testimony. *See, e.g.,* Laura E. Boeschen et al., *Rape Trauma Experts in the Courtroom,* 4 Psychol. Pub.

Pol'y & L. 414, 426 (1998) (conducting a meta-analysis of studies and finding that most practitioners have shifted their focus from rape trauma syndrome to a general discussion of posttraumatic stress disorder with rape as the triggering event).

the syndrome. Instead, the State attempted to offer evidence of typical rape-victim behaviors to dispel commonly-held rape myths that the jury might rely on in evaluating the evidence in the case.

Our more recent case law has recognized that such expert opinion testimony on the typical behaviors of victims of similar crimes may be helpful to the jury. Specifically, we have allowed expert witnesses to educate jurors about battered woman syndrome (BWS) and counterintuitive behaviors commonly associated with BWS. In *State v. Hennum*, we found that expert testimony on BWS "would help to explain a phenomenon not within the understanding of an ordinary lay person." 441 N.W.2d 793, 798 (Minn.1989). Specifically, we noted that educating the jury about BWS would "dispel the common misconception that a normal or reasonable person would not remain in such an abusive relationship" and "show the reasonableness of the defendant's fear that she was in imminent peril of death or serious bodily injury." *Id.* at 798. In *State v. Grecinger*, the State sought to admit expert testimony about BWS as an explanation for the complainant's three-year delay in reporting an incident of domestic abuse. 569 N.W.2d 189, 192–93 (Minn.1997). We again concluded "expert testimony on battered woman syndrome would help the jury to understand the behavior of a woman suffering from the syndrome, *which might otherwise be interpreted as a lack of credibility.*" *Id.* at 195 (emphasis added). As such, expert testimony on BWS was "necessary to explain the complexity of [the complainant]'s behavior and the reasons for her behavior." *Id.; see also State v. MacLennan*, 702 N.W.2d 219, 234 (Minn.2005) (holding that expert testimony on battered child syndrome "may help to explain a phenomenon not within the understanding of an ordinary lay person" and

"would be helpful to jurors struggling to discern whether elements of charged crimes have been met").

Additionally, we declined to extend *Saldana* to cases involving sexual assaults against children and adolescents, and concluded that expert testimony about counterintuitive behaviors of child- or adolescent-victims of sexual assault could aid jurors in their fact-finding. *State v. Hall*, 406 N.W.2d 503, 505 (Minn.1987) ("[I]n cases where a sexual assault victim is an adolescent, [general] expert testimony as to the reporting conduct of such victims and as to continued contact by the adolescent with the assailant is admissible in the proper exercise of discretion by the trial court...."); *State v. Myers*, 359 N.W.2d 604, 610 (Minn.1984) (holding that expert testimony into "puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation" of a child-victim of criminal sexual conduct was helpful to the jury).

Since our decision in *Saldana*, we have recognized that the experiences and reactions of victims of certain crimes are outside the common knowledge of the jury. In these cases, expert testimony on typical victim behavior may be helpful to assist the jury in evaluating the facts in the case. The rationale we applied in allowing expert testimony on the typical behaviors of battered women, battered children, and child- and adolescent-victims of criminal sexual conduct applies with equal force to expert-opinion testimony on typical rape-victim behaviors that are outside the common understanding of most jurors.

Finally, we note that a majority of state appellate courts that have considered this issue have allowed some form of expert-opinion evidence that describes typical counterintuitive behaviors exhibited by adult victims of sexual assault.[7] Our re-

---

7. *See, e.g., State v. Huey*, 145 Ariz. 59, 699 P.2d 1290, 1295 (1985) (admitting expert tes-

timony of rape trauma syndrome to show lack of consent); *State v. Brown*, 33 Cal.4th 892, 16 Cal.Rptr.3d 447, 94 P.3d 574, 588 (2004) (restating California's position that expert testimony on rape trauma syndrome is admissible "to explain counterintuitive out-of-court conduct"); *People v. Hampton*, 746 P.2d 947, 952 (Colo.1987) (admitting similar expert testimony because "[t]he lay notion of what behavior logically follows the experience of being raped may not be consistent with the actual behavior which social scientists have observed from studying rape victims"), *abrogated on other grounds by People v. Shreck*, 22 P.3d 68, 82 (Colo.2001); *State v. Ali*, 233 Conn. 403, 660 A.2d 337, 351–52 (1995) (holding that expert testimony of the general characteristics common among rape victims was admissible because such information was "not within the common knowledge and experience of the average juror"); *Harris v. State*, 283 Ga.App. 374, 641 S.E.2d 619, 625–26 (2007) ("Under Georgia law, an expert witness may testify 'as to the existence of certain typical patterns of behavior exhibited by victims of rape,' as long as the jury was permitted to draw for itself the final conclusion as to whether the victim in the case at hand was raped...."); *State v. Roles*, 122 Idaho 138, 832 P.2d 311, 319 (Idaho Ct.App. 1992), *rev. denied* (Idaho July 8, 1992) ("Expert testimony to help explain unusual behavior by the victim following such an incident [of rape] would be helpful to the trier of fact, where the defendant attributes the unusual behavior to other causes...."); *Simmons v. State*, 504 N.E.2d 575, 578–79 (Ind.1987) (admitting expert witness testimony that forgetting details and giving different accounts of the incident is normal occurrence among rape victims); *State v. Gettier*, 438 N.W.2d 1, 5–6 (Iowa 1989) (allowing expert testimony of "the typical reaction of a rape victim"); *State v. McQuillen*, 239 Kan. 590, 721 P.2d 740, 742 (1986) (admitting expert testimony about rape trauma syndrome to show victim's reaction was consistent with the observed symptoms of the syndrome); *State v. Chandler*, 939 So.2d 574, 582, 584 (La.Ct.App.2006) (allowing expert testimony "regarding the lack of physical injury in the majority of rape cases"); *State v. Whitmore*, 591 A.2d 244, 245 (Me. 1991) (holding that the trial court did not abuse its discretion by admitting expert medical testimony to explain alleged rape victim's counterintuitive behaviors after the alleged attack); *Hutton v. State*, 339 Md. 480, 663 A.2d 1289, 1301 (1995) (stating in dicta that expert testimony of posttraumatic stress dis-

order or rape trauma syndrome may be admissible "to explain behavior that might be viewed as inconsistent with the happening of the event, such as a delay in reporting"); *Commonwealth v. King*, 445 Mass. 217, 834 N.E.2d 1175, 1196 (2005) ("There is a continued need in sexual assault cases to counterbalance or address inaccurate assumptions regarding stereotypes about ... sexual assault victims in general."); *State v. Gonzalez*, 150 N.H. 74, 834 A.2d 354, 358 (2003) ("Because of its counterintuitive nature, expert testimony may be permitted to educate the jury about apparent inconsistent behavior by a victim following an assault...."); *State v. Fortin*, 162 N.J. 517, 745 A.2d 509, 518 (2000) (allowing expert testimony because the court "doubt[ed] that most jurors will have much familiarity with the pattern of injuries inflicted in rape cases"); *State v. Alberico*, 116 N.M. 156, 861 P.2d 192, 206–12 (1993) (holding that expert testimony about posttraumatic stress disorder was admissible to rebut a defendant's accusation that a rape victim was not credible because her behavior appeared inconsistent with having been raped); *People v. Taylor*, 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, 136 (1990) ("Because cultural myths still affect common understanding of rape and rape victims ... we believe that patterns of response among rape victims are not within the ordinary understanding of the lay juror."); *State v. Hall*, 330 N.C. 808, 412 S.E.2d 883, 891 (1992) (holding that expert testimony about posttraumatic stress disorder "may be admitted for corroborative purposes"); *State v. Solether*, No. WD–07–053, 2008 WL 4278210, at *9–10 (Ohio Ct.App. Sept. 19, 2008) (finding that a police officer's testimony about delayed reporting was expert testimony and was not admitted in error); *Key v. State*, 765 S.W.2d 848, 850 (Tex.App. 1989) (admitting expert testimony about the categories of rapists and victims' typical responses to each type of rape because such evidence was helpful to the jury); *State v. Kinney*, 171 Vt. 239, 762 A.2d 833, 842–43 (2000) ("[E]xpert evidence of rape trauma syndrome and the associated typical behavior of adult rape victims is admissible to assist the jury in evaluating the evidence, and frequently to respond to defense claims that the victim's behavior after the alleged rape was inconsistent with the claim that the rape occurred."); *State v. Ciskie*, 110 Wash.2d 263, 751 P.2d 1165, 1173–74 (1988) (allowing an expert to state a diagnosis of posttraumatic stress disorder when explaining a victim's de-

search reveals that only Minnesota and Pennsylvania[8] categorically prohibit expert testimony of this nature.

We conclude that the mental and physical reactions of an adult sexual-assault victim may lie outside the common understanding of an average juror. In a case such as this one, where consent is disputed, expert testimony on the typicality of delayed reporting, lack of physical injuries, and submissive behavior by rape victims may be helpful to the jury because it could assist the jury in evaluating evidence in the case that is relevant to the issue of consent. We agree with the Colorado Supreme Court, which explained:

> The lay notion of what behavior logically follows the experience of being raped may not be consistent with the actual behavior which social scientists have observed from studying rape victims.... Expert testimony that challenges or explains these assumptions [could be seen as] valuable information which the jury should hear and consider in its search for the truth.

*People v. Hampton,* 746 P.2d 947, 952 (Colo.1987), *abrogated on other grounds by People v. Shreck,* 22 P.3d 68, 82 (Colo. 2001).

Obeta argues that expert testimony on typical rape-victim behaviors is not helpful to the jury because it does not describe a phenomenon outside the common knowledge of the jury. Relying on a statistic that approximately one of every six American women has been the victim of rape or attempted rape, Obeta contends "an average jury of twelve persons will have had some experience of sexual relations between men and women." He further argues that expert testimony on typical rape-victim behaviors is not helpful to the jury because it is unreasonable to think that jurors in 2010 believe rape myths.

We disagree with Obeta's assertion that an average jury will necessarily be privy to the mental processes and physical reactions that accompany a sexual assault. The record, which includes recent studies on rape myths and their impact on jurors, refutes his claims. The research provided by the State and amici shows that the public holds and gives credence to rape myths. This record demonstrates that many jurors may wrongly believe that most sexual-assault victims will forcefully resist their assailant, suffer severe physical injuries—including vaginal injuries— and immediately report the attack. But social science contradicts these misconceptions about how victims actually respond to sexual assault. Furthermore, Obeta does not offer, and our research does not reveal,

---

layed report); *State v. McCoy,* 179 W.Va. 223, 366 S.E.2d 731, 736–37 (1988) (allowing expert testimony on rape trauma syndrome in rape prosecutions where the defense is consent and the expert's testimony is limited to whether the victim's behavior was consistent with the behavior of other sexual assault victims); *State v. Robinson,* 146 Wis.2d 315, 431 N.W.2d 165, 172 (1988) (allowing expert testimony about post-rape flat affect because it "assisted the jury in understanding reactions with which it perhaps was not familiar"); *Scadden v. State,* 732 P.2d 1036, 1044–48 (Wyo.1987) (allowing expert testimony about delayed reporting).

8. Pennsylvania has a per se prohibition against expert testimony on counterintuitive rape-victim behavior. *Commonwealth v. Balodis,* 560 Pa. 567, 747 A.2d 341, 345 (2000) (excluding expert testimony on the typicality of delayed reporting because "expert testimony as to the veracity of a particular class of people, of which the victim is a member, is inadmissible"). In 2010, the Pennsylvania General Assembly considered but did not enact legislation that would grant district courts discretion to admit "any recognized and accepted counterintuitive victim behavior." H.B. 2255, 2010 Gen. Assemb., Reg. Sess. (Pa.2010).

*any* social science literature that refutes the existence or prevalence of rape myths.

 We conclude that in a criminal sexual conduct case in which the defendant argues that the sexual conduct was consensual, the district court has discretion to admit expert-opinion evidence on the typicality of delayed reporting, lack of physical injuries, and submissive conduct by sexual-assault victims when the district court concludes that such evidence is relevant, helpful to the jury, and has foundational reliability. We reach this conclusion because the mental and physical reactions of an adult sexual-assault victim may be outside the common understanding of an average juror. Like the cases of battered women, battered children, and child- and adolescent-victims of criminal sexual conduct, expert testimony of typical behaviors by adult sexual-assault victims may be helpful to the jury in evaluating the evidence in a particular case. We observe that most states now allow some form of expert testimony that describes typical counterintuitive behaviors exhibited by adult victims of sexual assaults. We reaffirm our decision in *Saldana*, however, that prohibits expert testimony about rape trauma syndrome, the credibility of the complainant, or the ultimate question of whether the complainant was sexually assaulted. *See* 324 N.W.2d at 230–32. Accordingly, we reverse the district court's determination that the State's proffered expert testimony is inadmissible as a matter of law.

### C.

We express no opinion on whether the State's proposed expert testimony is relevant, helpful to the jury, and has foundational reliability. Rather, the application of Minn. R. Evid. 702 to proffered expert testimony lies within the sound discretion of the district court. *See State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn.1980). We therefore leave the specific application of Rule 702 and the subsequent question of admissibility to the sound discretion of the district court.

On remand, the State must establish that the proffered expert testimony on the typicality of delayed reporting, lack of physical injuries, and submissive conduct by sexual-assault victims is relevant and satisfies the requirements for admissibility in Minn. R. Evid. 702: (1) the witness must be qualified as expert; (2) the expert's opinion must exhibit foundational reliability; (3) the expert testimony must be helpful to the jury; and (4) if the testimony involves novel scientific theory, it must satisfy the *Frye–Mack* standard.[9] Additionally, the district court has the discretion to exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. Minn. R. Evid. 403; *see also Grecinger*, 569 N.W.2d at 196–97 (concluding that expert testimony of battered-woman syndrome was not unfairly prejudicial because the expert confined the testimony to a general description of the syndrome and did not express opinion on whether the complainant suffered from the syndrome or had been battered).

Reversed and remanded.

STRAS, Justice (dissenting).

The majority undoubtedly addresses an issue of great importance for sexual assault prosecutions in Minnesota. The majority does so, however, in a case over which we have no jurisdiction. Our rules

---

**9.** The parties appear to concede that expert testimony that educates jurors about typical rape-victim behaviors is not a novel scientific theory and thus not subject to *Frye–Mack*. We express no opinion on whether a *Frye–Mack* hearing is necessary in order to admit expert testimony on typical rape-victim behaviors.

are clear that in order to appeal a pretrial ruling excluding particular evidence, the State bears the burden of showing that the exclusion of the evidence will have a critical impact on its case. In exceptional circumstances, this court may also hear appeals when the interests of justice require review. Neither of those standards are satisfied here, as the majority implicitly concedes by carving out a novel jurisdictional standard. In my view, our jurisdictional rules are binding, and we have no authority to bypass them whenever we see fit. Accordingly, I would dismiss this case for lack of jurisdiction.

## I.

Our rules governing appellate jurisdiction permit the appeal of a pretrial order so long as the State can show that "the district court's alleged error, unless reversed, will have a critical impact on the outcome of the trial." Minn. R.Crim. P. 28.04, subd. 2. To meet this standard, the State bears the burden of showing "clearly and unequivocally (1) that the district court's ruling was erroneous and (2) that the ruling will have a 'critical impact' on the State's ability to prosecute the case." *State v. Underdahl,* 767 N.W.2d 677, 683 (Minn.2009) (citing *State v. McLeod,* 705 N.W.2d 776, 784 (Minn.2005)). If the State cannot satisfy its burden of demonstrating that the district court's pretrial order will have a critical impact on its case, our inquiry is at an end. *McLeod,* 705 N.W.2d at 784.

Though the State need not show that "the evidence 'completely destroys' the state's case," it must demonstrate that "excluding the evidence 'significantly reduces the likelihood of a successful prosecution.'" *Id.* (quoting *State v. Joon Kyu Kim,* 398 N.W.2d 544, 551 (Minn.1987)). We are more likely to find a critical impact when the excluded evidence, viewed in the context of the State's admissible evidence, is "particularly unique in nature and quality" and bears directly on the defendant's guilt or innocence. *In re the Welfare of L.E.P.,* 594 N.W.2d 163, 168–69 (Minn. 1999) (holding that suppression of a videotaped interview with the victim of child sexual abuse would critically impact the prosecution when the child was found incompetent to testify); *see also State v. Robb,* 605 N.W.2d 96, 99–100 (Minn.2000) (holding that suppression of a shotgun had a critical impact on the State's ability to prosecute the defendant for felonious possession of a firearm); *State v. Aubid,* 591 N.W.2d 472, 477 (Minn.1999) (holding that the exclusion of codefendants' trial testimony had a critical impact when there was no physical evidence connecting the defendant to a murder and the only eyewitness exhibited reluctance to testify); *State v. Ronnebaum,* 449 N.W.2d 722, 724 (Minn. 1990) (holding that suppression of a defendant's confession had a critical impact on the State's case).

The State, however, does not seek to introduce evidence that bears directly on Obeta's guilt or innocence. In this case, the State appeals the district court's exclusion of expert opinion testimony intended to correct jurors' misconceptions about typical rape-victim behaviors. As the majority states, the State seeks to admit this evidence to "assist the jury in evaluating evidence in the case that is relevant to the issue of consent," not to prove that Obeta committed the crime of criminal sexual conduct. We have never found critical impact based on the exclusion of evidence presented for the sole purpose of educating the jury. And for good reason: it is rarely, if ever, the case that expert evidence directed solely at jury education will have a critical impact on the State's ability to prosecute a case. Such evidence does not prove an element of the crime, directly bolster a witness's credibility, or even ex-

plain the investigation that led to the decision to charge the defendant with a crime. It is, at most, indirectly related to the State's ultimate objective of proving the defendant's guilt beyond a reasonable doubt.

Even if the indirect nature of the evidence presented in this case were not determinative of the critical impact question, the State still cannot meet its burden under the facts of this particular case. Our case law is clear that we must examine the disputed expert testimony in the context of all the other evidence that the State and defense are likely to produce at the trial. *See In re L.E.P.*, 594 N.W.2d at 168. This pretrial appeal is atypical because it reaches us after the court of appeals has already reversed Obeta's conviction and remanded for a new trial. *See State v. Obeta (Obeta I )*, No. A08–1419, 2009 WL 2596102, at *5–6 (Minn.App. Aug. 25, 2009), *rev. denied* (Minn. Nov. 17, 2009). Therefore, rather than speculating about whether the excluded evidence will "significantly reduce[ ] the likelihood of a successful prosecution," we can look to the evidence adduced at the first trial as representative of the type and quantum of evidence that may be presented at the retrial.

The defense is likely to raise three counterintuitive rape-victim behaviors at the retrial: that the complainant, M.B., waited approximately two to three hours before reporting the rape, did not struggle aggressively, and did not exhibit any vaginal injuries. To counter these facts, M.B. will have the opportunity to explain her own counterintuitive behaviors during her testimony at the retrial. Indeed, M.B. explained at the first trial that she did not report the assault immediately because she was scared, did not know if she wanted to put herself through a trial, and felt ashamed. By offering such explanations at the retrial, M.B. can provide the jury with information that will "assist [it] in evaluating evidence in the case that is relevant to the issue of consent." Furthermore, the State can elicit testimony that M.B. exhibited stereotypical rape-victim behaviors after the alleged assault. Specifically, witnesses can testify that M.B. was visibly upset in the aftermath of the incident. *See State v. Cao*, 788 N.W.2d 710, 718 (Minn.2010) (holding that prompt emotional reactions corroborate a complainant's allegation of rape). For example, one officer testified: "You could tell that [M.B.] was very upset. She was crying. Her shoulders slumped forward. I could tell something had happened to her." Therefore, the State will have the opportunity to address any counterintuitive behaviors exhibited by M.B. through her testimony and that of other lay witnesses.

The State's proffered expert opinion evidence is undoubtedly important, and the State has succeeded in showing that the exclusion of the evidence will adversely affect its ability to prosecute Obeta. However, an adverse effect on the State's ability to prosecute is *not* our test for critical impact.[1] Rather, the State must demonstrate "clearly and unequivocally" that the impact on its case will be *critical.*[2] The State has failed to meet that burden here.

1. No matter how compelling the circumstances, we must be cautious about expanding our critical impact jurisprudence. Unlike this court, the court of appeals has mandatory jurisdiction over appeals from pretrial orders. Expanding the scope of Minn. R.Crim. P. 28.04 could lead to a flood of pretrial appeals before the court of appeals, which would delay criminal trials and undermine judicial economy. *See State v. Barrett*, 694 N.W.2d 783, 787 (Minn.2005).

2. The State's pretrial appeal may fail for another reason. The other aspect of the critical impact inquiry is whether the State has "clearly and unequivocally show[n]" that the district court's ruling was erroneous. *See Un-*

## II.

When there is a clear jurisdictional rule on point, such as Minn. R.Crim. P. 28.04, subd. 2, that should be the end of our inquiry.[3] Strict construction of our jurisdictional rules is particularly important when the State has filed a pretrial appeal. *See State v. Rourke*, 773 N.W.2d 913, 923 (Minn.2009) (noting our disinclination to hear appeals by the State in criminal cases). As we have stated, hearing appeals by the State in criminal cases is "contrary to common law and therefore must be expressly conferred by statute or must arise by necessary implication." *In re the Welfare of C.W.S.*, 267 N.W.2d 496, 498 (Minn.1978).

Nonetheless, it appears that the majority invokes a novel, hybrid rule of jurisdiction based upon our authority to review cases in the interests of justice and our supervisory power to ensure the fair administration of justice. Both the precise basis and scope of the majority's jurisdictional rule are unclear. To the extent I understand the majority's analysis, I would conclude that our case law does not support the exercise of jurisdiction here.

### A.

Our authority to review cases in the interests of justice arises only in "rare and exceptional" circumstances. *Vang v. State*, 788 N.W.2d 111, 114–15 (Minn.2010).

The extraordinary nature of our inherent authority to hear cases over which we would otherwise have no jurisdiction is evident from the limited circumstances in which we have invoked that authority. *See, e.g., id.* (exercising inherent authority to review a potentially time-barred post-conviction appeal in "a rare and exceptional case" in which the State Public Defender's Office declined to file a direct appeal on behalf of a fourteen-year-old defendant who was tried as an adult and convicted of first-degree murder); *State v. Lessley*, 779 N.W.2d 825, 832 (Minn.2010) (reviewing the issue of whether the State must consent to a defendant's waiver of the right to a jury trial in the interests of justice because the appeal involved "a critical constitutional issue . . . capable of repetition yet evading review in the future"); *State v. Kromah*, 657 N.W.2d 564, 566 (Minn.2003) (reviewing joined cases concerning the admissibility of DNA evidence without deciding whether the exclusion of the DNA evidence had a critical impact because we "expect[ed] that the record in the joined cases . . . would provide a more complete and updated record for our review in deciding the complex issues surrounding DNA testing").

. The majority argues that this case is "rare and exceptional" because Minnesota courts frequently misinterpret *State v. Sal-*

---

*derdahl*, 767 N.W.2d at 683. As the majority notes, Minnesota courts (including the court of appeals) have routinely interpreted *Saldana* as a per se prohibition against the type of expert opinion evidence offered in this case. Given that courts have generally interpreted *Saldana* in accordance with the view of the district court in this case, it is at best questionable whether the State has shown that the district court's order was "clearly and unequivocally" erroneous.

**3.** The majority argues that this statement is inconsistent with our case law recognizing our authority to decide cases in the interests

of justice without addressing critical impact. *See State v. Lessley*, 779 N.W.2d 825, 832 (Minn.2010); *State v. Kromah*, 657 N.W.2d 564, 566 (Minn.2003). The cases discussed by the majority invoking our inherent authority, however, represent the exception to our jurisdictional rules. We invoke our inherent authority in only the most exceptional circumstances, *see Vang v. State*, 788 N.W.2d 111, 114–15 (Minn.2010), which, as discussed below, are not present here. Any other interpretation of our case law permits the exception to swallow the rule.

*dana,* 324 N.W.2d 227 (Minn.1982), and the issue presented by this case is unlikely to come before us again in the near future. I disagree. We had jurisdiction to review the very question presented by this case when the State filed a petition for further review following the court of appeals' reversal of Obeta's conviction and remand for a new trial in *Obeta I.* To be sure, the majority correctly concludes that some, and perhaps even most, Minnesota courts misinterpret *Saldana* as creating a categorical prohibition against *any* expert testimony regarding the behavior of rape victims. But the very fact that this case was brought before us previously proves that some courts employ an appropriately narrow reading of *Saldana.*[4] In fact, the Minnesota County Attorneys Association states in its amicus brief that at least one county attorney routinely, and successfully, elicits testimony from sexual assault nurses "that there is no typical reaction to a sexual assault, and that it is 'not uncommon' that an individual would suffer no physical injury or delay reporting." A conviction based on such testimony would presumably provide us with jurisdiction to decide the exact question presented here: whether expert opinion evidence on counterintuitive rape-victim behaviors is admissible in a criminal sexual conduct case in which the defendant argues that the sex was consensual.

**B.**

The majority's invocation of our "inherent judicial authority to regulate and supervise the rules that govern the admission of evidence in the lower courts," fares no better as a basis for jurisdiction. Only on rare occasions have we invoked our supervisory powers over the administration of justice to review cases, and then only to announce new, watershed rules of criminal procedure. *See, e.g., State v. Scales,* 518 N.W.2d 587, 592 (Minn.1994) (adopting a new evidentiary rule requiring all custodial interrogations to be recorded and suppressing per se all unrecorded statements); *State v. Lefthand,* 488 N.W.2d 799, 801–02 (Minn.1992) (clarifying previous statements made by the court in dicta to explicitly hold that custodial interrogations of represented parties should not proceed without notification to or the presence of counsel); *State v. Borst,* 278 Minn. 388, 397, 154 N.W.2d 888, 894 (1967) (holding that counsel must be provided to any defendant before the court may impose a sentence of incarceration). If the majority were overruling *Saldana,* perhaps the majority could make a tenuous analogy to *Scales, Lefthand,* and *Borst.* All the majority has done here, however, is to write a narrow opinion that clarifies one aspect of *Saldana.*

Even more misplaced is the majority's reliance on our power to adopt rules of evidence and procedure. *See, e.g., State v.*

---

**4.** The majority is simply mistaken when it suggests that we could not have reviewed the question presented in this case in the appeal from *Obeta I.* The court of appeals reversed and remanded for a new trial in *Obeta I* based in part on the fact that a sexual assault nurse examiner improperly testified "about common injuries to and characteristics of sexual assault victims." *Obeta I,* 2009 WL 2596102, at *3. The court of appeals held that the nurse's testimony was inadmissible under *Saldana. Id.* Though the record was admittedly not as extensive in *Obeta I,* the record

certainly was sufficient to permit this court to answer the question addressed today by the majority opinion: whether courts have read *Saldana* too broadly as prohibiting all expert opinion evidence regarding rape-victim behaviors. Besides, the adequacy of the record in *Obeta I* is irrelevant in light of the majority's narrow decision today, which leaves to the sound discretion of the district courts all questions of fact necessary to determine admissibility under Minn. R. Evid. 702, including the foundational reliability of the expert evidence and its helpfulness to the jury.

*McCoy,* 682 N.W.2d 153, 160 (Minn.2004) (stating that the court has the authority to apply Minnesota Statutes governing the admissibility of evidence even when the statutes conflict with the Minnesota Rules of Evidence); *State v. Willis,* 332 N.W.2d 180, 184 (Minn.1983) ("Inherently, the courts have the power to establish the rules of evidence."); *In re Tracy,* 197 Minn. 35, 47, 266 N.W. 88, 93 (1936) ("[C]ourts must be permitted to determine for themselves what they will and what they will not consider as competent evidence."), *as modified by* 197 Minn. 35, 267 N.W. 142. To be sure, this court has the inherent power to adopt and amend the rules of evidence. *State v. Willis,* 332 N.W.2d at 184. But that rulemaking function does not provide an independent source of power to review cases over which we would otherwise have no jurisdiction. Indeed, the majority opinion does not even clarify or adopt a specific rule of evidence,[5] meaning that any discussion of our inherent authority to adopt rules of evidence is immaterial.

### III.

It is understandable that the majority struggles to find relevant authority to support its exercise of jurisdiction; none of the doctrines the majority invokes fit the circumstances of this case. Our rules do not provide jurisdiction because the State cannot show that the exclusion of expert testimony offered to educate the jury on counterintuitive rape-victim behaviors will have a critical impact on its ability to prosecute Obeta. Nor is this an "exceptional and rare" case warranting review in the interests of justice. Finally, this case does not involve the creation of a watershed rule of criminal procedure or the

adoption of a new rule of evidence. Rather, the novel, hybrid rule adopted by the majority appears to be that this court will review a case if it presents an important question of law and the error would be difficult to fix otherwise. Because that is not one of the grounds for jurisdiction found in a statute or rule, I respectfully dissent.

PAGE, Justice (dissenting).

I join in the dissent of Justice Stras.

---

5. We ordinarily rely on our rules committees to propose, evaluate, and recommend the amendment or adoption of rules of evidence and procedure. To the extent the majority amends or adopts a rule of evidence in this case, it has circumvented the normal process for the consideration and adoption of new rules.